# CASES ADJUDGED

IN THE

# SUPREME COURT OF THE UNITED STATES,

AT

## OCTOBER TERM, 1900.

---

## EAST TENNESSEE, VIRGINIA AND GEORGIA RAILWAY COMPANY *v.* INTERSTATE COMMERCE COMMISSION.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 175. Argued February 26, 27, 1900.—Decided April 8, 1901.

Although the Interstate Commerce Commission found as a fact that the competition at Nashville, which forms the basis of the contention in this case, was of such a preponderating nature that the carriers must either continue to charge a lesser rate for a longer haul to Nashville than was asked for the shorter haul to Chattanooga, or to abandon all Nashville traffic, nevertheless they were forbidden by the Act of February 4, 1887, c. 104, 24 Stat. 379, to make the lesser charge for the longer haul; but since that ruling of the commission was made it has been settled by this court in *Louisville & Nashville Railroad Company* v. *Behlmer*, 175 U. S. 648, and other cases cited, that competition which is controlling on traffic and rates produces in and of itself the dissimilarity of circumstance and condition described in the statute, and that where this condition exists a carrier has a right of his own motion to take it into view in fixing rates to the competitive point; and it follows that the construction affixed by the commission to the statute upon which its entire action in this case was predicated was wrong.

The only principle by which it is possible to enforce the whole statute is the construction adopted by the previous opinions of this court; that is, that

a competition which is real and substantial, and exercises a potential influence on rates to a particular point, brings into play the dissimilarity of circumstance and condition provided by the statute, and justifies the lesser charge to the more distant and competitive point than to the nearer and non-competitive place, and that this right is not destroyed by the mere fact that, incidentally, the lesser charge to the competitive point may seemingly give a preference to that point, and the greater rate to the non-competitive point may apparently engender a discrimination against it.

It is plain that all the premises of fact upon which the propositions of law decided by the Circuit Court of Appeals rest, are at variance with the propositions of fact found by the commission, in so far as that body passed upon the facts; and this court accordingly reversed the decree of that court, and ordered the case remanded to the Circuit Court with instructions to set aside its decree adjudging that the order of the commission be enforced, and to dismiss the application made for that purpose with costs, the whole to be without prejudice to the right of the commission to proceed upon the evidence already introduced before it, or upon such further pleadings and evidence as it may allow to be made or introduced and to hear and determine the controversy according to law.

THE Board of Trade of Chattanooga, Tennessee, a chartered corporation, petitioned the Interstate Commerce Commission for relief under the act to regulate commerce. The defendants, the East Tennessee, Virginia and Georgia Railway, and numerous other rail and steamship companies, were alleged to be common carriers subject to the act to regulate commerce, and engaged in the transportation of passengers and freight by all rail or partly by rail and water from Boston, New York, Philadelphia, Baltimore and other places on the eastern seaboard to Chattanooga, Nashville and Memphis in the State of Tennessee.

It was alleged that the defendants conveyed freight from the eastern seaboard through and beyond Chattanooga to the cities of Nashville and Memphis for a lesser rate to such long distance points than was charged by them for like freight to Chattanooga, the shorter distance. This it was averred was a violation of section 4 of the act, prohibiting a greater charge for the shorter than for the longer haul, under substantially similar circumstances and conditions. And the disregard of the statute in the particular just stated, it was asserted, necessarily gave rise to violations of other provisions of the act to

regulate commerce, viz., of section 1, which forbids unjust and unreasonable charges, and of section 3, making unlawful the giving of undue or unreasonable preferences.

It is unnecessary to consider the complaint of the lesser charge to Memphis, the longer, than to Chattanooga, the shorter, distance, since this grievance was in effect held by the commission to be without substantial merit; and its conclusion on this subject was not reviewed by either of the courts below, and it is not now seriously, if at all, questioned. After hearing, the commission made elaborate findings of fact, and stated the legal conclusions which were deduced therefrom. 4 Inters. Com. Rep. 213; 5 I. C. C. Rep. 546. An order was made forbidding the defendant carriers from charging a greater compensation for the transportation for the shorter distance to Chattanooga than was demanded to Nashville, the longer distance. The execution, however, of this order, was suspended until a date named, so that the carriers might have opportunity to apply to the commission to be relieved from the operation of the order. No application to be exempted having been made, and the carriers not having conformed to the behests of the commission, this proceeding to compel obedience was commenced in the Circuit Court. In that court additional testimony was taken, but it was all merely cumulative of that which had been adduced before the commission. The Circuit Court, 85 Fed. Rep. 107, whilst not approving the reasoning by which the commission had sustained the order by it entered, nevertheless on other grounds affirmed the command of the commission. The Circuit Court of Appeals for the Sixth Circuit, to which the case was taken, whilst it held that the commission had misapplied the law, and although it did not approve of the reasoning given by the Circuit Court for its decree, nevertheless affirmed the action of that court. 99 Fed. Rep. 52.

*Mr. Edward Baxter* for appellant.

*Mr. L. A. Shaver* for appellee. *Mr. Assistant Attorney General Boyd* was on his brief.

Mr. Justice White, after making the foregoing statement of the case, delivered the opinion of the court.

To comprehend the contentions which are made on this record it is essential to give a summary of the condition as depicted in the findings of the commission, and upon which the relief which it granted was based.

The state of affairs was as follows: Freight from the eastern seaboard to Cincinnati and other western points, north of the Ohio River, was controlled by the classification and tariff of rates prevailing in what was denominated as the northern or Trunk Line territory. On the other hand, the area south of the Ohio River, which was denominated the southern territory, was governed by the classification and tariff of rates prevailing in that territory; such classification and tariff giving rise in most instances to a higher charge than that which prevailed in the northern territory. This general difference between the rates in the northern and those in the southern territory the commission found arose from inherent causes, and although they might in some aspects disadvantageously influence traffic in the southern territory, were yet the result of such essentially normal conditions as to give rise to no just cause of complaint. On this subject the commission said:

"There may be some disadvantage to Chattanooga from this circumstance, since an article of a given class under the first-named system may be in a lower class under the other system, but the injury, if any, resulting from differences of that character is not believed to be serious.

"The general range of rates in the territory covered by the Southern Railway and Steamship Association is materially higher than in the territory of the Trunk Line Association, the difference resulting mainly from the much greater volume of traffic in the latter section; and it is inevitable that difficulties should exist and complaints arise along the line of division between varying systems of classification and like methods of traffic construction."

The grievance alleged arose in this wise: Where freight destined to a point in the southern territory instead of being sent

by the southern route was shipped from the eastern seaboard, by the northern or trunk line, *via* Cincinnati or other trunk line points north of the Ohio River, it would be classified and charged for according to the northern . trunk line rates.    B· . . such freight thus shipped through the trunk line or northern route bound for Chattanooga or other southern points on leaving Cincinnati and on entering the southern area, for the purpose of completing the transit, became subject to the southern classification and rates.    Thus, irrespective of the mere form and considering the substance of things, the charge on freight shipped in this way was made according to the northern classification and rate for the transportation in the northern territory to points on the Ohio River, plus the southern classification and rates from those points to the place in the southern territory to which the freight was ultimately destined, this being equivalent to the rate which the merchandise would have borne had it been shipped so as to subject it wholly to the southern territory rates.

This was, however, not universally the case.    The single exception (eliminating Memphis from view) was this: The Louisville and Nashville Railroad, operating from Cincinnati to Nashville, instead of causing the merchandise shipped from the eastern seaboard through Cincinnati to Nashville to bear the southern territory classification and rate from Cincinnati to Nashville, submitted the traffic between Cincinnati and Nashville to the northern instead of to the southern territory rates. It hence followed that merchandise shipped from the eastern seaboard to Nashville through the northern territory bore a less charge than it would have borne if shipped to Nashville through the southern territory.

To compete with the Louisville and Nashville Railroad for Nashville traffic, the carriers in the southern territory fixed their rate to Nashville so as to make it as low as that charged to that point by the Louisville and Nashville Railroad.    It hence came to pass that freight shipped from the eastern seaboard to Chattanooga paid the southern rate, whilst freight shipped to Nashville, although it passed through Chattanooga, went on to Nashville at the lower rate there prevailing, which

lower rate was caused by the action of the Louisville and Nashville Railroad in exceptionally reducing its charge to Nashville. We say, by the action of the Louisville and Nashville Railroad, because the findings of the commission expressly establish that the exceptional rate to Nashville, which was established by the Louisville and Nashville Railroad, was not caused by water competition at Nashville, but was exclusively the result of the action of the Louisville and Nashville Railroad in exceptionally charging a lower rate to Nashville different from that which it demanded for traffic to other points through the southern territory. That the other carriers through the southern territory, including those operating from Chattanooga to Nashville, were, in consequence of this condition at Nashville, compelled either to adjust their rates to Nashville to meet the competition or abandon all freight traffic to Nashville, was found by the commission to be beyond dispute. On both these subjects the commission said, p. 219:

" There might, of course, be such an advance in rail rates that shipments from the east would take the water route from Cincinnati. What amount of difference would produce that result it is impossible to determine from the testimony; but we find that such difference might be substantially greater than it is at present without important effect upon the railroad tonnage from the east, and that the through rate to Nashville is in no sense controlled by water competition at that point, either actually encountered or seriously apprehended.

\* \* \* \* \* \* \* \*

" The lower rates accepted by the carriers engaged in the transportation of eastern merchandise to Nashville via Chattanooga are not forced upon them by any water competition at the former place. In performing this service for the compensation fixed by the present tariffs, these carriers are not affected by the circumstance that water communication exists between Cincinnati and Nashville. The Nashville rate is independent of the lines operating through Chattanooga, and those lines have no voice in determining its amount. That rate is made by the all-rail carriers via Cincinnati, and their action is uncontrolled by the defendant lines. The competition which the latter meet

at Nashville is distinctly the competition of the trunk lines and the Louisville and Nashville system whose northern termini are at points on the Ohio River which receive trunk-line rates on eastern shipments. The competitors of the defendants for this Nashville traffic, therefore, are the railroads from the Atlantic seaboard reaching Nashville by way of Cincinnati, etc., all of which are interstate carriers subject to the act to regulate commerce. These carriers established rates and united in joint tariffs from eastern points to Nashville long before the lines through Chattanooga engaged in the Nashville business. Acceptance of the rates so fixed by the rail lines *via* Cincinnati was the necessary condition upon which the lines *via* Chattanooga could compete for Nashville traffic."

Although the commission thus found that the competitive conditions at Nashville rendered it absolutely necessary for the other roads to adjust their charges, so as to meet the competition, if they wished to engage in freight traffic to Nashville, it nevertheless held that the carriers had no lawful right to consider the competition at Nashville in adjusting their rates to that place. This was predicated solely upon the fact that the competition existing at Nashville was caused by carriers who were subject to the act to regulate commerce, and under the view which the commission entertained of the law to regulate commerce, competition of that character could not be availed of by a carrier as establishing substantially dissimilar circumstances and conditions, without a prior application by the carrier to the commission, for the purpose of obtaining its sanction to taking such competitive conditions into consideration for the purpose of fixing rates to the competitive point. The commission, in support of this construction of the statute, referred to a previous opinion by it announced in the case of the *Georgia Railroad Commission* v. *Clyde Steamship Company et al.*, 4 Inters. Com. Rep. 120; 5 I. C. C. Rep. 324. The proposition decided in the case cited, which it was held governed the case at bar, was thus stated:

"'The carrier has the right to judge in the first instance whether it is justified in making the greater charge for the shorter distance under the fourth section in all cases where the

circumstances and conditions arise wholly upon its own line or through competition for the same traffic with carriers not subject to regulation under the act to regulate commerce. In other cases under the fourth section the circumstances and conditions are not presumptively dissimilar, and carriers must not charge less for the longer distance except upon the order of this commission.'"

Applying this proposition, the commission said:

"We must hold that the lower rates accorded by the defendants on shipments to Nashville are without warrant of law, and that the higher charges exacted on shipments to Chattanooga cannot be sanctioned in this proceeding."

The order entered by the commission was confined solely to the greater charge to Chattanooga, the shorter, than to Nashville, the longer, distance. Omitting mere recitals, it was adjudged that certain named defendants, "or such of them as are or may be engaged in the transportation of property from New York and other Atlantic seaboard points to Chattanooga or through Chattanooga to Nashville, in the State of Tennessee, be and they severally are hereby required to cease and desist from charging or receiving any greater compensation in the aggregate for the transportation of like kind of property from New York, Boston, Philadelphia, Baltimore, or other Atlantic seaboard cities, for the shorter distance to Chattanooga than for the longer distance over the same line in the same direction to Nashville. That for the purpose of enabling said defendants to apply to the commission for relief under the proviso clause of the fourth section of the act to regulate commerce, this order is hereby suspended until the first day of February, 1893; but the same will take effect and be in force from and after that date unless such application be made prior thereto. In case such relief shall be applied for within the time mentioned the question of further suspending this order until the hearing and determination of such application will be duly considered."

The record makes it clear that in allowing this order the commission thought that its literal enforcement would bring about an injustice, and therefore that the order was entered solely because it was deemed that the technical requirements of the

statute must be complied with.   It is also patent from the reasons given by the commission for allowing the order that the commission refrained from considering or passing on any other question arising, either expressly or by implication, from the complaint, such as the reasonableness *per se* of the rates in controversy or the discrimination which might be produced by them.   And it also obviously appears that the examination of the issues was thus confined solely to the alleged violation of the long and short haul clause, because it was deemed that all questions as to reasonableness of rates *per se* or discrimination arising therefrom could more properly be considered by the commission when application was made by the carriers to be relieved from the restraints of the long and short haul clause within the time and in accordance with the permission granted by the order, which was rendered.   The commission on these subjects said :

"In justice to the various parties in interest, however, it should be added that this disposition of the case is not intended to preclude the defendants from applying to the commission for relief from the restrictions imposed by the fourth section of the act, on the ground that the situation in which they are placed with reference to this Nashville traffic constitutes one of the 'special cases' to which the proviso clause of that section should be applied.

"It is stated in the foregoing findings that the present Nashville rate is prescribed by the rail lines reaching that point *via* Cincinnati, and that the defendant lines through Chattanooga have no voice or influence in determining its amount.   These lines are under compulsion, therefore, to meet the rates which other carriers have established, or leave those carriers in undisturbed possession of the entire traffic.   They have no alternative but to accept the measure of compensation dictated by independent rivals, or abandon the large percentage of Nashville business which they now secure.   In addition to this, the geographical position of these two cities, the diverse character and divergent courses of the several groups of lines which connect them with the Atlantic seaboard, the varying systems of classifications by which they are severally affected, and the greater

volume of traffic at the lower rates prevailing in the trunk-line territory, are existing conditions which govern, to some degree at least, the transportation in question. For these conditions the carriers complained of do not appear chiefly responsible, because the lower rate to Nashville is beyond their control, and the allowance of the same rate to the shorter-distance point might reduce their revenues below the limits of fair compensation. Without in any sense prejudging the case, we hold that the defendants may invoke its consideration in an appropriate proceeding.

"Any such intimation, however, should not be understood as covering an implied indorsement of the present disparity of rates as between Chattanooga and Nashville, for no such inference is intended. The suggestion here made goes no further than the propriety of an unprejudiced investigation when permission to deviate from the general rule of the statute is applied for by these carriers on account of the special circumstances by which they are surrounded. It seems improbable that the discrimination complained of can be made less oppressive by any increase in the Nashville rate, and on that assumption the only practical relief is a reduction in rates to Chattanooga. We are aware of the difficulties attending a readjustment upon that basis, but we cannot regard then as insuperable.

*    *    *    *    *    *    *    *

"We entertain little doubt, therefore, that equity between shipper and carrier requires some reduction in the rates now enforced on Chattanooga traffic from Atlantic points, and are convinced of the necessity for such a reduction to secure relative justice between that town and Nashville. We refrain from further statement of the reasons which have induced this conclusion, as the amount to which the Chattanooga rate should be reduced will not now be decided. If the carriers engaged in Nashville transportation through Chattanooga act upon the suggestion above made, and apply for relief from the restrictive rule laid down in the fourth section, the subject can be more fully considered in disposing of that application."

After reciting the fact that the case had been on both sides presented to the commission under the assumption that the

rights of the parties could be adequately adjusted by determining only the controversy arising from the long and short haul clause of the act, the commission added :

"The questions which may arise if permission is sought to depart from the general rule relating to long and short hauls was not specially discussed. On this ground, also, it would seem suitable to allow opportunity for a further hearing before fixing maximum rates on shipments to Chattanooga."

Taking into view the terms of the order and the reasons given by the commission for considering only one aspect of the controversy and excluding all others, it is obvious that that body construed the act to regulate commerce as meaning that, however controlling competition might be on rates to any given place, if it arose from the action of one or more carriers who were subject to the law to regulate commerce, the dissimilarity of circumstance and condition provided in the fourth section could not be produced by such competition unless the previous assent of the commission was given to the taking by the carrier of such competition into view in fixing rates to the competitive point. This in effect was to say that the dissimilarity of circumstance and condition prescribed in the law was not the criterion by which to determine the right of a carrier to charge a lesser rate for the longer than for the shorter distance unless the assent of the commission was asked and given. This in substance but decided that the dissimilarity of circumstances and conditions prescribed in the law was not the rule by which to determine the right of a carrier to charge a lesser rate for the longer than for the shorter distance, but that such right solely sprang from the assent of the commission. In other words, that the dissimilarity of circumstances and conditions became a factor only in consequence of an act of grace or of a discretion flowing from or exercised by the commission. This logical result of the construction of the statute adopted by the commission was well illustrated by the facts found by it and to which the theory announced was in this case applied. Thus, although the commission found as a fact that the competition at Nashville was of such a preponderating nature that the carriers must either continue to charge a lesser rate for a longer

haul to Nashville than was asked for the shorter haul to Chattanooga or to abandon all Nashville traffic, nevertheless they were forbidden to make the lesser charge for the longer haul. In other words, they were ordered to desist from all Nashville traffic, unless they applied to the commission for the privilege of continuing such traffic by obtaining its assent to meet the dominant rate prevailing at Nashville. But since the ruling of the commission was made in this case, it has been settled by this court that competition which is controlling on traffic and rates produces in and of itself the dissimilarity of circumstance and condition described in the statute, and that where this condition exists a carrier has a right of his own motion to take it into view in fixing rates to the competitive point. That is to say, that the dissimilarity of circumstance and condition pointed out by the statute which relieves from the long and short haul clause arises from the command of the statute and not from the assent of the commission; the law, and not the discretion of the commission, determining the rights of the parties. It follows that the construction affixed by the commission to the statute upon which its entire action was predicated was wrong. *Texas & Pacific Railway Co.* v. *Interstate Commerce Commission*, 162 U. S. 197; *Interstate Commerce Commission* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 164; *Louisville & Nashville Railroad Company* v. *Behlmer*, 175 U. S. 648, 654, 655.

Although it thus appears that the commission erred in its construction of the statute, nevertheless, it is insisted that the action of the commission should be affirmed. This contention is supported by propositions which are stated in argument in many different forms, but are really all reducible to the following summary :

Granting that the commission wrongfully held that the carriers had no right of their own motion to avail of the competition at Nashville as producing the dissimilarity of circumstance and condition provided in the statute, nevertheless the order made by the commission was right, because as there was a difference between the rate charged to Nashville and that exacted to Chattanooga, there necessarily resulted an undue preference in favor of Nashville and a discrimination against Chattanooga,

falling within the inhibition of the third section of the act to regulate commerce. And, it is argued, even conceding this to be erroneous, as it was established by the proof that the Nashville rates were adequate, the Chattanooga rates were consequently unreasonably high, and hence were *per se* unreasonable. Assuming this proposition to be without foundation, it is insisted, as Chattanooga was a point at which various railroads centered, it was therefore in a position where, if competition had been allowed full play, it would have a rate at least as low as that at Nashville; and as the proof showed that the higher rate prevailing at Chattanooga was fixed by consent or agreement among the carriers, therefore Chattanooga by the effect of such agreement was deprived of the benefits of competition; the deduction being that the carriers who thus by agreement prevented the normal forces of competition from exerting their proper influence at Chattanooga, should not be allowed to avail of the competition at Nashville to charge a lesser rate to that point than they did to Chattanooga. Besides, it is urged that as it was shown that the lower rate at Nashville was caused by the conduct of the Louisville and Nashville Railroad in exceptionally making lower charges from Cincinnati to Nashville that road should not be permitted to give a preference to Nashville and then avail itself of the preference thus given to discriminate against Chattanooga, which would be the case if the difference of rates on freight passing through Chattanooga to Nashville were allowed to continue. This proposition being predicated on the assertion that it was established by proof that the line between Chattanooga and Nashville over which the traffic *via* the southern territory, passing through Chattanooga from the Atlantic seaboard, moved to Nashville was in legal effect to be considered the Louisville and Nashville Railroad, since that corporation was the owner of a majority of the stock of such line between Chattanooga and Nashville, and, therefore, in effect, controlled it.

Pausing for a moment to generally consider the foregoing contentions, it becomes manifest that in so far as they embody propositions of law, they concede the error of the legal construction applied by the commission and yet invoke a seemingly

different construction by which the erroneous rule of the commission is to be in substance upheld. It is also clear that the propositions of fact which they embody cover the field of inquiry which the commission excluded from view; and which that body held could not be ascertained from the record before it, but must be developed from the new inquiry which it was proposed to make when leave to depart from the restrictions of the long and short haul clause was invoked by the carriers at the hands of the commission. Indeed, it is substantially accurate to say that the propositions of fact now asserted not only do this, but in effect are repugnant to the conclusions of fact found by the commission on the branch of the controversy to which the commission actually extended the inquiry by it made. It might well suffice to allow the result just stated to which the propositions necessarily lead to serve as a demonstration of their unsoundness. Inasmuch, however, as the legal contention embodied in the propositions was in substance adopted by the Circuit Court upon the assumption that its action in so doing was in accord with the decision of this court in the case of *Interstate Commerce Commission* v. *Alabama Midland Railway Co.*, 168 U. S. 144, and as some of the propositions of fact received the sanction of the Circuit Court of Appeals and were made the basis of its decree enforcing the order of the commission, we will proceed to analyze them to the extent necessary to determine our duty in relation to them.

Coming to do so, it is at once apparent that the contentions divide themselves into two classes, the first, a proposition of law involving the construction of the act to regulate commerce and the others embracing ultimate deductions from the facts proven. The legal proposition is this, that where in consequence of competitive conditions existing at a particular point, the dissimilarity of circumstance provided in the fourth section of the act arises, it cannot justify a carrier on his own motion in charging a lesser rate for the longer haul to the competitive point than is asked for the shorter haul to the non-competitive point, if in doing so a preference in favor of the competitive point arises or a discrimination against the non-competitive point is produced. That is to say, it is insisted that the provision as to substan-

tially dissimilar circumstances and conditions of the fourth section and the commands of the third section as to discrimination and undue preference being found in the one statute must be construed together, so that the dissimilarity of circumstance and condition cannot be availed of if either discrimination or preference will arise from doing so. We quote the exact language in which this proposition is stated by counsel, reproducing the italics by which the import of the contention is emphasized:

"*Fifth.* That the injury or prejudice to Chattanooga, shown by the proof to be the effect of the discriminations practiced against Chattanooga and in favor of Nashville, *brings the case within the evil which the act to regulate commerce was designed to remedy, and that competition, no matter how forceful, should not be held to nullify the law itself—in other words, should not be held to justify the very wrongs which the law was enacted to remedy.*"

It is argued that this proposition is sustained by the opinions in the *Alabama Midland* case, 168 U. S. 144, and in *Louisville & Nashville Railroad Co.* v. *Behlmer,* 175 U. S. 648, in both of which cases, as we have seen, the right of the carrier to take into view on his own motion competition which substantially affected traffic and rates as the producing cause of dissimilarity of circumstance and condition was upheld.

The portion of the opinion relied upon in the *Alabama Midland* case is found on page 167, and is as follows:

"In order further to guard against any misapprehension of the scope of our decision, it may be well to observe that we do not hold that the mere fact of competition, no matter what its character or extent, necessarily relieves the carrier from the restraints of the third and fourth sections, but only that these sections are not so stringent and imperative as to exclude in all cases the matter of competition from consideration in determining the questions of 'undue or unreasonable preference or advantage,' or what are 'substantially similar circumstances and conditions.' The competition may in some cases be such as, having due regard to the interests of the public and of the carrier, ought justly to have effect upon the rates, and in such cases

there is no absolute rule which prevents the commission or the courts from taking that matter into consideration."

The expressions in the *Behlmer* case which are relied upon. are found on page 674 of the opinion in that case, and are as follows:

"It follows that whilst the carrier may take into consideration the existence of competition as the producing cause of dissimilar circumstances and conditions, his right to do so is governed by the following principles: First, the absolute command of the statute that all rates shall be just and reasonable and that no undue discrimination be brought about, though, in the nature of things, this latter consideration may, in many cases, be involved in the determination of whether competition was such as created a substantial dissimilarity of condition; second, that the competition relied upon be not artificial or merely conjectural, but material and substantial, thereby operating on the question of traffic and rate making, the right in every event to be only enjoyed with a due regard to the interest of the public, after giving full weight to the benefits to be conferred on the place from whence the traffic moved as well as those to be derived by the locality to which it is to be delivered."

The reasoning which we have thus quoted in the opinions in question, it is insisted, maintains the doctrine that although competition of the character therein described may serve to engender dissimilarity of circumstance and condition which a carrier can avail of of its own motion, it does not necessarily do so. Whether it can be allowed to produce this effect, it is argued, must depend upon all the surrounding circumstances, such as the preference or discrimination which may arise from allowing it to be done and the degree to which the interests of the public may be injuriously affected by permitting it to do so. To support this view, it is argued, " that to hold otherwise would be placing Congress in the absurd position of laying down a rule and then providing that the rule should not be enforced in the only cases in which violations of the rule were known to exist. In other words, enacting a law and providing at the same time that it should be of no effect."

But in substance this reasoning only amounts to the assertion

that the settled construction of the statute, by which it has been held that real and substantial competition gives rise to the dissimilarity of circumstance and condition, pointed out in the fourth section, is wrong, and should be overruled. The language of the opinions which is relied upon must be read in connection with its context, and must be construed by the light of the issue which was in controversy in the cases and which was decided; that is, the right of the carrier to take the competitive conditions into consideration as creating dissimilarity of circumstance and condition. The right of a carrier to do so could not have been sustained if the proposition now asserted had not necessarily been decided to be unsound. The summing up or grouping of the various provisions of the act which was made in the passages relied upon but served to point out that the provisions of the statute allowing competition to become the cause of dissimilarity of circumstance and condition could operate no injurious effect in view of the other provisions of the act protecting against discrimination and preference; that is, the undue preference and unjust discrimination against which the other provisions of the statute were aimed. True it is that all of the provisions of the statute must be interpreted together, and because this is the elementary rule the argument now pressed upon our attention is unsound. If it were adopted, it would follow of necessity that competition could never create such a dissimilarity of circumstance and condition as would justify the lesser charge to the competitive point than was made to the non-competitive point. This would be the inevitable consequence, since under the view which the argument assumes it would be impossible for the lesser rate to prevail to the competitive point without creating a preference in favor of that point, and without giving rise to a discrimination against the non-competitive point to which the higher rate was asked. Thus the reasoning conduces to the deduction which it is advanced to refute; that is, the assumption that the statute at one and the same time expressly confers a right, and yet specifically destroys it. This is plainly the consequence flowing from the argument that competition, "however forceful" it may be, cannot produce dissimilarity of circumstance and condition if dis-

VOL. CLXXXI—2

crimination and preference is held to necessarily arise from the charging of the lesser rate to the longer distance competitive point.

It is not difficult to perceive the origin of the fallacy upon which the contention rests. It is found in blending the third and fourth sections in such a manner as necessarily to destroy one by the other instead of construing them so as to cause them to operate harmoniously. In a supposed case when, in the first instance, upon an issue as to a violation of the fourth section of the act, it is conceded or established that the rates charged to the shorter distance point are just and reasonable in and of themselves, and it is also shown that the lesser rate charged for the longer haul is not wholly unremunerative and has been forced upon the carriers by competition at the longer distance point, it must result that a discrimination springing alone from a disparity in rates cannot be held, in legal effect, to be the voluntary act of the defendant carriers, and as a consequence the provisions of the third section of the act forbidding the making or giving of an undue or unreasonable preference or advantage will not apply. The prohibition of the third section, when that section is considered in its proper relation, is directed against unjust discrimination or undue preference arising from the voluntary and wrongful act of the carriers complained of as having given undue preference, and does not relate to acts the result of conditions wholly beyond the control of such carriers. And special attention was directed to this view in the *Behlmer* case, in the passage which we have previously excerpted. To otherwise construe the statute would involve a departure from its plain language, and would be to confound cause with effect. For, if the preference occasioned in favor of a particular place by competition there gives rise to the right to charge the lesser rate to that point, it cannot be that the availing of this right is the cause of the preference, and especially is this made clear in the case supposed, since it is manifest that forbidding the carrier to meet the competition would not remove the discrimination.

The only principle by which it is possible to enforce the whole statute is the construction adopted by the previous opin-

ions of this court; that is, that competition which is real and substantial, and exercises a potential influence on rates to a particular point, brings into play the dissimilarity of circumstance and condition provided by the statute, and justifies the lesser charge to the more distant and competitive point than to the nearer and non-competitive place, and that this right is not destroyed by the mere fact that incidentally the lesser charge to the competitive point may seemingly give a preference to that point, and the greater rate to the non-competitive point may apparently engender a discrimination against it.   We say seemingly on the one hand and apparently on the other, because in the supposed cases the preference is not "undue" or the discrimination "unjust."   This is clearly so, when it is considered that the lesser charge upon which both the assumption of preference and discrimination is predicated is sanctioned by the statute, which causes the competition to give rise to the right to make such lesser charge.   Indeed, the findings of fact made by the commission in this case leave no room for the contention that either undue preference in favor of Nashville or unjust discrimination against Chattanooga arose merely from the act of the carriers in meeting the competition existing at Nashville.   The commission found that if the defendant carriers had not adjusted their rates to meet the competitive condition at Nashville, the only consequence would have been to deflect the traffic at the reduced rates over other lines.   From this it follows that, even although the defendant carriers had not taken the dissimilarity of circumstance and condition into view, and had continued their rates to Nashville just as if there had been no dissimilarity of circumstance and condition, the preference in favor of Nashville growing out of the conditions there existing would have remained in force and hence the discrimination which thereby arose against Chattanooga would have likewise continued to exist.   In other words, both Nashville and Chattanooga would have been exactly in the same position if the long and short haul clause had not been brought into play.

That, as indicated in the previous opinions of this court, there may be cases where the carrier cannot be allowed to avail of

the competitive condition because of the public interests and the other provisions of the statute, is of course clear. What particular environment may in every case produce this result cannot be in advance indicated. But the suggestion of an obvious case is not inappropriate. Take a case where the carrier cannot meet the competitive rate to a given point without transporting the merchandise at less than the cost of transportation, and therefore without bringing about a deficiency, which would have to be met by increased charges upon other business. Clearly, in such a case, the engaging in such competitive traffic would both bring about an unjust discrimination and a disregard of the public interest, since a tendency towards unreasonable rates on other business would arise from the carriage of traffic at less than the cost of transportation to particular places. But no condition of this character is here in question, since the commission find as follows:

"There is a conceded margin of profit in the rates now in force to Nashville and Memphis, with reference to the additional expense incurred in carrying eastern traffic to those destinations, but whether that margin affords reasonable compensation for the services thus rendered cannot be determined from the evidence."

And the fact thus established was not controverted either in the opinion of the Circuit Court or in that of the Circuit Court of Appeals, and is not now denied. Applying the principle to which we have adverted to the condition as above stated, it is apparent that if the carrier was prevented under the circumstances from meeting the competitive rate at Nashville, when it could be done at a margin of profit over the cost of transportation, it would produce the very discrimination which would spring from allowing the carrier to meet a competitive rate where the traffic must be carried at an actual loss. To compel the carriers to desist from all Nashville traffic under the circumstances stated would simply result in deflecting the traffic to Nashville to other routes, and thus entail upon the carriers who were inhibited from meeting the competition, although they could do so at a margin of profit, the loss which would arise from the disappearance of such business, without anywise benefiting the public.

The Circuit Court in enforcing the order of the commission did not seemingly adopt the full scope of the proposition which we have just considered, but applied it in a modified form. Thus, it concluded that although the charge of the lesser rate to the longer point, in some instances, might be justified by the dissimilarity of circumstance and condition arising from competition, and therefore would not *per se* necessarily produce a preference, it would do so if by comparison between the dissimilarity of circumstance and condition and the dissimilarity of charge it was found that the one was disproportionate to the other.

After referring to the previous rulings of the commission maintaining that competition by carriers subject to the act could not be taken into view by a carrier in fixing rates to the competitive points without the previous assent of the commission, the court (85 Fed. Rep. 117) quoted the following statement of the commission in an opinion announced on December 31, 1897.:

"Since then, however, the Supreme Court of the United States, by its decision in the case, *Interstate Commerce Commission* v. *Alabama Midland Railway Company*, (decided Nov. 8, 1897,) 168 U. S. 144, has determined that this view of the law is erroneous, and that railway competition may create such dissimilar circumstances and conditions as exempt the carrier from an observance of the long and short haul provision. Under this interpretation of the law, as applied to the facts found in this case, we are of the opinion that the charging of the higher rate to the intermediate points, as set forth, is not obnoxious to the fourth section. The section declares that the carrier shall not make the higher charge to the nearer point under 'substantially similar circumstances and conditions.' If the conditions and circumstances are not substantially similar, then the section does not apply, and the carrier is not bound to regard it in the making of its tariffs." 

The court thereupon said :

" Now, I do not understand that such a conclusion follows from that decision. On the contrary, I suppose that when a violation of the long and short haul provision is charged, com-

petition is one of the elements which enter into the determination whether the conditions are similar, and if a dissimilarity is found, then the further question arises whether the dissimilarity is so great as to justify the discrimination which is complained of. The language of the act ought not to be tied up by such literal construction. If it were, then if it should be found that the dissimilarity of conditions is really in favor of the locality discriminated against, the provision would not apply, a result contrary to the manifest intent. In other words, my opinion is that the restraint of section 4 is to be applied upon the scale of comparison between the dissimilarity of conditions and the disparity of rates, and that it is competent under that section to restrain the exaction of the greater charge for the shorter haul, although there may be a substantial dissimilarity of conditions, provided the dissimilarity is not so great as to justify the discrimination made. But the long and short haul clause is only one of the specific provisions employed for the general purpose of the act. The third section underlies the fourth and supplies the principles on which it rests; so that, if the literal construction referred to be put upon the fourth section, the case would still be exposed to the third section, which forbids undue preference to one locality or the subjection of another to any undue disadvantage."

But this reasoning, whilst it does not apparently wholly rest on the erroneous view which we have previously refuted, in substance but applies it. Indeed, it not only does this, but it more markedly destroys one provision of the statute by the other, since it in effect declares that the greater the competition at any given point the lesser power has this fact to produce the dissimilarity of circumstance and condition provided in the statute. That such is the conclusion to which the reasoning resolves itself must be the case, when it is considered that the more active competition is at a particular point the lesser the rate will be to that point, and the greater, therefore, the disparity between the charge to the competitive point than that made to the non-competitive one. The proposition then is this, that the greater and more potential is the influence of competition on rates and traffic, the less will be its force to en-

gender dissimilarity of circumstance and condition ; that is to say, that the causes specified in the statute are to be allowed to produce their influence in inverse ratio to their strength and importance.

As the Circuit Court only affirmed the order of the commission, which directed the carriers to desist from charging a greater compensation for the shorter haul to Chattanooga than for the longer haul to Nashville, there is no room for the conclusion that it found affirmatively that independently of the charge to Nashville the rate to Chattanooga was *per se* unreasonable. For, of course, a decree which ordered the carriers to desist from charging a greater compensation for the lesser than for the longer haul, would be in no way responsive to the conclusion that the rate for the lesser distance was unreasonable in and of itself. Such a decree would in effect authorize the carrier to continue to charge at its election a rate which was in itself unreasonable to the shorter point. Indeed, it cannot be held that the order rested upon the unreasonableness *per se* of the rate to Chattanooga, without implying that the court directed and commanded the carrier to bring about a preference and discrimination by charging the same price for the carriage of traffic to Nashville, the much more distant point, than was exacted for the carriage to Chattanooga.

Coming then to the propositions of fact, we repeat that each and every one of them either involve considerations which were wholly excluded from view by the commission, under the construction of the statute which was applied, because it was deemed that they would present themselves for consideration when the carrier petitioned the commission to be relieved from the restrictions of the long and short haul clause, and moreover that these propositions of fact are not in harmony with the findings made by the commission on the particular subject which it passed on. That the propositions of fact referred to are amenable to the considerations we have just stated is indisputable, when it is considered that taken together they assert the existence of conditions which the commission decided could not be ascertained in the state of the record before it, but could only be arrived at by a further unprejudiced ex-

amination, which, under the view taken, it was unnecessary to make until a future time. And that the facts now relied on are irreconcilable with what was found by the commission on the subject which it passed on is likewise clear. Thus, the contention that the rate to Chattanooga is shown to have been absolutely fixed by agreement, and therefore to be abnormally high, is necessarily repugnant to the express finding of the commission that the rates in the southern territory, whilst originally the offspring of agreement, were also the result of the volume of business in that territory, and although they might give rise to some disadvantage, did not do so to the extent of making the rates in and of themselves a just subject of complaint. So, also, the insistence that it is shown that Chattanooga by its position was entitled to at least an equality of rates with Nashville is repugnant to the finding of the commission, that whilst it was shown that some reduction would be just at Chattanooga, the degree of that reduction could not be determined without a further investigation embracing the relation of Chattanooga to other points and without a careful readjustment of the rates to such points. Again, the assertion that the road from Chattanooga to Nashville growing out of the stock ownership was in legal effect the Louisville and Nashville Railroad, is necessarily antagonistic to the express finding of the commission, that the carriers through Chattanooga to Nashville were placed in a position where they must either meet the competition at Nashville or abandon all traffic to that point. The question which then arises is, shall this court now pass upon all the issues which the commission excluded from view, because of a mistake in law committed by that body, and in doing so not only overthrow the findings of fact made by the commission, but also adopt new findings antagnostic to those which the commission made, and this for the purpose, not of affirming the order entered by that body, but to enable us to reach a result which the commission itself declared could only be justly arrived at after a further and unprejudiced investigation by it of the situation which the controversy involves?

True, it is insisted that such original action is not required at

our hands, because, it is asserted, the Circuit Court of Appeals considered and passed on the propositions, relied upon, and the action of that court relieves this court from the duty of entering upon an original investigation of the whole evidence to determine the entire field of controversy.

It requires only, however, a brief reference to the opinion of the Circuit Court of Appeals to show that this contention is unfounded. In substance, that court stated in its opinion that it considered that the rates to Chattanooga, which was in the southern territory, had been fixed by agreement of the carriers as had been the other rates in that territory; that as Nashville, which was also in the southern territory, was given a low rate, because of the action of the Louisville and Nashville Railroad in exceptionally lowering its rates from Cincinnati to that point, the situation at Chattanooga entitled it to the same rates. The court, moreover, thought that the Louisville and Nashville Railroad, which owned the line from Cincinnati to Nashville, was in no position, as the owner of a majority of the stock in the road from Chattanooga to Nashville, to avail of the competition at Nashville as a basis for charging the lesser rate for the longer haul through Chattanooga to Nashville. It was besides concluded that where a rate to a particular point was the product of agreement, which stifled competition, such rate could not become the basis upon which to predicate the right of a carrier to charge a lesser sum for the carriage of freight passing through that point to a more distant place, because of the competition at such more distant place. The court summed up its conclusions as follows (99 Fed. Rep. 63):

"We are pressed with the argument that to reduce the rates to Chattanooga will upset the whole southern schedule of rates, and create the greatest confusion; that for a decade Chattanooga has been grouped with towns to the south and west of her, shown in the diagram; and that her rates have been the key to the southern situation. The length of time which an abuse has continued does not justify it. It was because time had not corrected abuses of discrimination that the interstate commerce act was passed. The group in which Chattanooga is placed, shown by the diagram above, puts her on an equality

in respect to eastern rates with towns and cities of much less size and business, and much further removed from the region of trunk-line rates, and with much fewer natural competitive advantages. If taking Chattanooga out of this group and putting it with Nashville requires a readjustment of rates in the south, this is no ground for refusing to do justice to Chattanooga. The truth is, that Chattanooga is too advantageously situated with respect to her railway connections to the north and east to be made the first city of importance to bear the heavier burden of southern rates, when Nashville, her natural competitor, is given northern rates. The line of division between northern and southern rates ought not to be drawn so as to put her to the south of it, if Nashville is to be put to the north of it. And we feel convinced from a close examination of the evidence that, but for the restriction of normal competition by the Southern Traffic Association, her situation would win for her certainly the same rates as Nashville. It may be that the difficulty of readjusting rates on a new basis is what has delayed justice to Chattanooga. It may well be so formidable as to furnish a motive for maintaining an old abuse."

The decree which was entered, however, did not declare the rates charged to Chattanooga to be unreasonable, but simply affirmed the order of the commission directing that no greater sum be charged for the carriage of freight to Chattanooga, the shorter, than was exacted to Nashville, the longer, distance. As we have already shown, such a decree is not responsive to the conclusion that the rates to Chattanooga were in and of themselves unreasonable, since the right to continue to exact them was sanctioned, provided the traffic to Nashville was either abandoned or the rate to Chattanooga made the same as to Nashville.

Without taking at all into view the legal propositions announced by the Circuit Court of Appeals in its opinion, and conceding, without passing upon such questions, that they were all correctly decided, it is plain that all the premises of fact upon which the propositions of law decided by the Circuit Court of Appeals rest are at variance with the propositions of fact found by the commission, in so far as that body passed upon

the facts.   From this it results that to decide the case in the aspect in which it is now presented we would be obliged to go into the whole evidence, as a matter of original impression, in order to determine the complex questions which the case presents.   Among those which of necessity would arise for decision would be whether the original agreement fixing rates to the southern territory, made long since and acted on consecutively for years, was of such a nature as to cause those rates to be illegal, although they might be found to be just and reasonable in and of themselves.   If not, whether Chattanooga was from its situation properly embraced in the southern territory, and, if not, whether the Louisville and Nashville Railroad had violated the law by exceptionally reducing its rates to Nashville. If it had not, did it follow, because the condition at Nashville gave that city an exceptionally low rate, that Chattanooga was in a position to be entitled, as a matter of right, to as low or a lesser rate?

To state these issues is at once to demonstrate that their decision, as a matter of first impression, properly belonged to the commission, since upon that body the law has specially imposed the duty of considering them.   Whilst the court has in the discharge of its duty been at times constrained to correct erroneous constructions which have been put by the commission upon the statute, it has steadily refused, because of the fact just stated, to assume to exert its original judgment on the facts, where, under the statute, it was entitled, before approaching the facts, to the aid which must necessarily be afforded by the previous enlightened judgment of the commission upon such subjects.   This rule is aptly illustrated by the opinion in *Louisville & Nashville Railroad Co.* v. *Behlmer,* (1900) 175 U. S. 648, in which case, after pointing out the same error of construction adopted and applied by the commission in the present case, the court declined to undertake an original investigation of the facts, saying (p. 675):

"If, then, we were to undertake the duty of weighing the evidence in this record, we would be called upon, as a matter of original action, to investigate all these serious considerations which were shut out from view by the commission, and were

not weighed by the Circuit Court of Appeals, because both the commission and the court erroneously construed the statute. But the law attributes *prima facie* effect to the findings of fact made by the commission, and that body, from the nature of its origanization and the duties imposed upon it by the statute, is peculiarly competent to pass upon questions of fact of the character here arising. In *Texas & Pacific Railway* v. *Interstate Commerce Commission*, *ubi supra*, the court found the fact to be that the commission had failed to consider and give weight to the proof in the record, affecting the question before it, on a mistaken view taken by it of the law, and that on review of the action of the commission the Circuit Court of Appeals, whilst considering that the legal conclusion of the commission was wrong, nevertheless proceeded as a matter of original investigation to weigh the testimony and determine the facts flowing from it. The court said (p. 238):

" ' If the Circuit Court of Appeals was of opinion that the commission in making its order had misconceived the extent of its powers, and if the Circuit Court had erred in affirming the validity of an order made under such misconception, the duty of the Circuit Court of Appeals was to reverse the decree, set aside the order and remand the cause to the commission in order that it might, if it saw fit, proceed therein according to law. The defendant was entitled to have its defence considered, in the first instance at least, by the commission upon a full consideration of all the circumstances and conditions upon which a legitimate order could be founded. The question whether certain charges were reasonable or otherwise, whether certain discriminations were due or undue, were questions of fact, to be passed upon by the commission in the light of all the facts duly alleged and supported by competent evidence, and it did not comport with the true scheme of the statute that the Circuit Court of Appeals should undertake, of its own motion, to find and pass upon such questions of fact in a case in the position in which the present one was.'

" We think these views should be applied in the case now under review."

*The decree of the Circuit Court of Appeals should be reversed with costs and the case be remanded to the Circuit Court with instructions to set aside its decree adjudging that the order of the commission be enforced, and to dismiss the application made for that purpose with costs, the whole to be without prejudice to the right of the commission to proceed upon the evidence already introduced before it or upon such further pleadings and evidence as it may allow to be made or introduced, to hear and determine the matter in controversy according to law.*

MR. JUSTICE HARLAN dissented.