INTERSTATE COMMERCE COMMISSION v. CINCINNATI, P. & V. R. CO. et al.

(Circuit Court, E. D. North Carolina. August 10, 1903.)

1. CARRIERS—INTERSTATE COMMERCE LAW—UNDUE PREFERENCE IN RATES BETWEEN LOCALITIES.

Conditions are such at Norfolk and Richmond, Va., by reason of the large number of carrying lines, both rail and water, which enter such places, and the fact that they are in what is known as the "trunk line territory," as to create a very active competition on shipments from the West, and to justify the making of low rates on such shipments; and the fact that such low rates are made on through shipments from Chicago, St. Louis, and East St. Louis by a material reduction from local tariff rates by the connecting lines west of the Ohio river, while substantially the local rates are charged on the same lines on through shipments from the same points to Wilmington, N. C., which is not within the trunk line territory, but in the southern territory, and has fewer lines of transportation, and less active competition, resulting in higher through rates to the latter place, although the length of haul is substantially the same, does not operate to give Norfolk and Richmond an undue or unreasonable preference or advantage, or subject Wilmington to an undue or unreasonable prejudice or disadvantage, in violation of section 3 of the act to regulate commerce (24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]).

In Equity. Suit by the Interstate Commerce Commission to enforce an order in respect to rates charged by defendant railroad companies.

L. A. Shaver and Harry Shinner, U. S. Atty., for complainant.
Ed. Baxter, for respondents.

PURNELL, District Judge.   The bill herein by the Interstate Commerce Commission under section 16 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]) seeks the enforcement of an order of the commission against the Cincinnati, Portsmouth & Virginia Railroad Company and other carriers.   The order was the outcome of a complaint to the commission under section 13 of the act to regulate commerce (24 Stat. 383 [U. S. Comp. St. 1901, p. 3164]), made by the Wilmington Tariff Association, incorporated under the laws of the state of North Carolina.   Defendant carriers constitute through lines of transportation and transport traffic under joint through rates from Chicago, St. Louis, East St. Louis, Cincinnati, and Louisville to Norfolk, Richmond, and other Virginia cities, and also to Wilmington, N. C., and the complaint of the Wilmington Tariff Association to the commission charged:   First, the rates of the defendants for the transportation of traffic from said cities to Wilmington were unreasonable in themselves, in violation of section 1 of the law (24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), which requires all rates charged to be just and reasonable; and, secondly, that the rates to Wilmington, taken in connection with the rates from the same cities to Norfolk, Richmond, and other Virginia cities, subject "merchants and dealers at Wilmington, their traffic, and the city of Wilmington" to undue or unreasonable prejudice or disadvantage, and give the merchants or dealers of Norfolk, Richmond, and other Virginia cities an undue or unreasonable preference or advantage over merchants and dealers of Wilmington, in violation of section 3 of the act to regulate commerce (24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]).   The commission found that the rates in question were unduly prejudicial to Wilmington, and unduly preferential to Norfolk, Richmond, and Virginia cities, and in pursuance of such finding issued the order for the enforcement of which this proceeding was instituted.   The order forbids the continuance of the alleged undue prejudice to Wilmington and undue preference to Norfolk, Richmond, and other Virginia cities.   The defendants refused to obey the order, and thereupon the commission instituted this proceeding for its enforcement under section 16 of the act to regulate commerce (24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]).

The bill alleges the due issuance of the order, its service upon the defendants, and their refusal to obey.   It further alleges all the proceedings before the commission leading up to the order, and attaches as exhibits the complaint, the answers of the carriers thereto, and the order.   After making these allegations, the bill charges that the rates to Wilmington and to Norfolk subject Wilmington to an undue prejudice, and give Norfolk an undue preference over Wilmington, in violation of the law, on the facts as found by the commission and alleged in its bill.   The issue presented is under section 3, which is as follows:

"That it shall be unlawful for any common carrier subject to the provisions of the act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality or any particular description of traffic in any respect whatsoever,

124 F.—40

or to subject any particular person, company, firm, corporation or locality or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

The complaint of the Wilmington Tariff Association related to the rates from Cincinnati and Louisville, as well as from St. Louis, East St. Louis, and Chicago; but the commission found that the rates from Cincinnati and Louisville were not unreasonable, but only the rates from St. Louis, East St. Louis, and Chicago were unlawful, and the order of the commission relates only to those rates. Norfolk and Wilmington are both seaports, and it is conceded there is no material difference in the distance from the shipping points from Chicago and East St. Louis to Norfolk and to Wilmington, respectively, via the short line to Norfolk, being 40 miles less, and from East St. Louis 30 miles more, than to Wilmington. In short, all the facts seem to be conceded, as are the rates and differences; the only contention being, are these rates such as are inhibited, unduly prejudicial to Wilmington, and unduly preferential to Norfolk, Richmond, and other Virginia cities and stations? The rates from St. Louis and East St. Louis being practically the same, it is unnecessary to speak of both, and the one may be understood to include the other. The rates from Cincinnati and Louisville to Wilmington are found by the commission to be in excess of the rates to Norfolk and Richmond on 100 pounds first class 20 cents, second class 14 cents, etc., or, on car-load lots of 40,000 pounds, $80 first class; $58 second class; $50 third class; $54 fourth class; $36 fifth class; $26 sixth class; flour in sacks, $32; flour in barrels, $60; packing house products, $4; grain, $22. But these rates, as found by the commission, are not such as are prohibited, and no rates not in excess of 135 per cent. of the Norfolk rates are deemed or held to be unlawful. The excess under-rates from Chicago are as follows: On 100 pounds first class, 50 cents; second class, 40 cents; third class, 31 cents; fourth class, 26 cents; fifth class, 20 cents; sixth class, 15 cents; flour in sacks, 15.5 cents; flour in barrels, 29 cents; hay, 5.5 cents; grain, 18 cents. Or, on car-load lots of 40,000 pounds, first class, $200; second class, $160; third class, $124; fourth class, $104; fifth class, $80; flour in sacks, $62; flour in barrels, $116; grain, $72; hay, $22. Excess on rates from East St. Louis, excess of Wilmington rates per 100 pounds: First class, 36 cents; second class, 28.5 cents; third class, 23 cents; fourth class, 20.5 cents; fifth class, 15 cents; sixth class, 11 cents; flour in sacks, 12.5 cents; flour in barrels, 23 cents; grain, 8 cents; hay, 6.5 cents. Excesses of Wilmington rates per car-load lot of 40,000 pounds: First class, $144; second class, $114; third class, $92; fourth class, $82; fifth class, $60; sixth class, $44; flour in sacks, $50; flour in barrels, $92; grain, $32; hay, $26. The table of tariff rates from which these excesses appear are set out in the bill and exhibits attached, the correctness of which is not denied, but admitted.

The commission, in effect, finds the rates to Wilmington should exceed the rates to Norfolk, Richmond, and other Virginia cities, but say they should not do so by more than 135 per cent. The rates to Norfolk, Richmond, and other Virginia cities are fixed—set forth

in the bill and exhibits—and there is no suggestion these rates should be increased. It would be a simple calculation to determine what 135 per cent. of these rates would be under this rule, or what they should not exceed. The old rule of three would settle this. This is fixing the maximum rates, which the commission cannot do under the statute; hence the last section of the order is unauthorized. Fixing freight rates is a complex science, requiring a trained mind—a specialist experienced in the business. The Interstate Commerce Commission is created as an expert body, not, however, vested with authority to fix rates, maximum or minimum. This is conceded in the argument, as it is that the commission has no power to say what proportion each carrier of a through line shall receive of a through rate; but it is contended that the order relates to the through rate as an entirety, and as to this the commission may dissect a through rate, and consider the proportion received by one carrier of the line, and if it finds that the proportion received by it is its local rate, fixed for a strictly local haul, vitiate the entire rate. As the commission finds the rates from Cincinnati and Louisville are not unlawful, unduly prejudicial, and preferential, the rates found to be unduly prejudicial and preferential, therefore, must necessarily be between these points on the Ohio river and St. Louis, East St. Louis, and Chicago. Conceding the contention above referred to, without, however, deciding it, as it is not deemed essential, the rates found to be unduly prejudicial and preferential are on lines in a territory north of the Ohio river, where there is great competition, and circumstances which tend to fix rates govern freight tariffs. This question, asked during the argument, for a better understanding of the facts, seemed to surprise counsel, but it is apparent from the record, the table, etc., as being the important and essential question in this proceeding. In short, the carriers connecting these points charge their local tariff rates as a part of the through rates to Wilmington, but not to Richmond, Norfolk, and Virginia points, and this when the traffic is carried over the same lines, possibly in the same cars. Is there any valid reason under the law for this difference? These lines are in a highly competitive territory, where the trunk line rates obtain, fixed by competition with the waterway via the lakes, for all lines which serve the great eastern ports on the Atlantic seaboard—Boston, New York, Philadelphia, and Baltimore. That these rates are so fixed and highly competitive is too well recognized and has been too often sustained to require a citation of the numerous authorities to this effect. It is so. These rates, for reasons satisfactory—among others, the numerous steamship lines from Richmond and Norfolk, the competing railroads, and the water transportation from Baltimore to Norfolk or Richmond—have been extended to these points from the West. Wilmington is supplied by branch lines of two railroad systems, the Atlantic Coast Line and the Seaboard Air Line systems, and one weekly line (the Clyde) of steamers to and from New York. These rates have not yet been extended to Wilmington. The one—Norfolk, Richmond, and other points in Virginia—are in what is known as the trunk line territory, while Wilmington is not, but is in southern territory, where the competition for freight is not so active.

The rates from Cincinnati and Louisville are found not be unjustly prejudicial and preferential, though much higher, as shown in the records. It is said freight can be shipped by rail from Chicago, St. Louis, and East St. Louis to New York, thence by steamer to Wilmington, cheaper than it can by rail. But the commission was not asked to remedy this. The remedy is plain; let the freight be so shipped; and this court is not called upon to consider this question. The only effect it can have in this proceeding, as may be said of many suggestions of this character in the argument, is to prove the active competition within, and the absence of such active competition without, the trunk line territory. Wilmington has two systems of railroads without western termini—i. e., they do not connect directly with the territory west of the Ohio river—and one weekly line of steamers to New York. Norfolk has several systems of railroads extending in the direction of and connections to the point where the undue prejudice and preference originates and exists, with several lines of steamers to Baltimore, Philadelphia, New York, and Boston, some of them daily. If competition controls rates—and there is no contention that it should not and does not—Norfolk and Richmond are territorially located to be entitled to trunk line rates which have been extended to that territory. Interstate Commerce Commission v. Railway Co., 168 U. S. 145, 18 Sup. Ct. 45, 42 L. Ed. 414. This trunk line rate is not shown to have been extended to Norfolk and Richmond from any disposition to favor these points or prejudice Wilmington, but on account of the competition referred to, and the construction put upon the long and short haul clause of the act to regulate commerce of 1898, and since insisted on by the Chesapeake & Ohio Railway Company, the lines of which extend from Newport News, on the same harbor as Norfolk, in a commercial sense one and the same with Norfolk, insight, connected with the ocean by the same inlet, etc., virtually the same for the purposes of commerce, to the Ohio river in the territory where the evil complained of exists, if it exists at all in a legal sense.

At both ends of the through lines, then, there is sharp, active, legitimate competition—at Norfolk meaning the termini of all railroad routes to the harbor, for it can make no material difference on which side of the harbor, Chesapeake Bay or Elizabeth river, the terminal station of a railroad system is located, all being deep-water terminals and shipping stations; and at Chicago, St. Louis, and East St. Louis. On the other hand, the competition at Wilmington, with one line of steamers and two systems of railroad, is not near so great, active, and sharp. If the rule established by the courts in the case cited and others, concluding with E. T., V. & G. R. R. Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719, be applied, there are sufficient reasons for dissimilarity in rates, as said in the decision just cited. The court in the case supra, sections 1 and 2 of the syllabus in 181 U. S., says:

"Although the Interstate Commerce Commission found as a fact that the competition at Nashville, which forms the basis of the contention in this case, was of such a preponderating nature that the carriers must either continue to charge a lesser rate for a longer haul to Nashville than was

asked for the shorter haul to Chattanooga, or to abandon all Nashville traffic, nevertheless they were forbidden by the act of February 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], to make the lesser charge for the longer haul; but since that ruling of the commission was made it has been settled by this court in Louisville & Nashville R. R. Co. v. Behlmer, 175 U. S. 648 [20 Sup. Ct. 209, 44 L. Ed. 309], and other cases cited, that competition which is controlling on traffic and rates produces in and of itself the dissimilarity of circumstance and condition described in the statute, and that, where this condition exists, a carrier has a right of his own motion to take it into view in fixing rates to the competitive point; and it follows that the construction affixed by the commission to the statute upon which its entire action in this case was predicated was wrong. The only principle by which it is possible to enforce the whole statute is the construction adopted by the previous opinions of this court; that is, that a competition which is real and substantial, and exercises a potential influence on rates to a particular point, brings into play the dissimilarity of circumstance and condition provided by the statute, and justifies the lesser charge to the more distant and competitive point than to the nearer and noncompetitive place; and this right is not destroyed by the mere fact that incidentally the lesser charge to the competitive point may seemingly give a preference to that point, and the greater rate to the noncompetitive point may apparently engender a discrimination against it."

The rule cited above applies with equal force to Richmond, with several systems of railroads and steamship lines, though water competition may not be so active.

The various other points—"other cities in Virginia"—do not require to be specifically considered, as they are not subjects of the complaint, only figure in the proceeding incidentally; and, the rates to the termini, Norfolk and Richmond, being fixed in conformity with the law, rates to these intermediate points would be probably controlled by the long and short distance haul rule (section 4 of the act to regulate commerce, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), as construed by the Interstate Commerce Commission and the courts. Rates to these points are used (as are different points in North Carolina to which rates are much higher) in the discussion as illustrations and argument, but the question presented for decision is under section 3, and not under the long and short haul clause (section 4). It will be in apt time to consider this phase when a proceeding is instituted presenting this question. To pass upon these rates now would be aliunde the record, and not germane to the question presented.

Having seen how the rates to Richmond and Norfolk are fixed, and that they are in accordance with the rule laid down by the Supreme Court, there being no complaint that these rates are too low, or should be increased, it is in order to inquire how the Wilmington rates are fixed. The rates to Wilmington are the through rates to Norfolk and Richmond plus the combination or competing rates of two railroads, the Atlantic Coast Line and the Seaboard Air Line and the waterway via the Atlantic Ocean and the Cape Fear river. These rates, for these reasons, because they are combination and competitive rates, are less than to any other point in North Carolina; Wilmington being outside the trunk line territory (as said, in "Southern territory," where trunk line rates do not obtain), but having two systems of railroads and water transportation—about 30 miles from the ocean via Cape Fear river. On this waterway it is said rates

are higher than they would be naturally on account of the stringent laws and high charges for pilotage to and from the bar, and for other incidental expenses. One regular line of steamers and such tramp steamships or other vessels which come irregularly to bring or get special cargoes cannot create such active competition as exists at Norfolk, or even at Richmond. Why, it is not essential to discuss. It does not. The absence of competition causes the differences. Competition fixes freight rates, as it gives life to commerce. The commission finds that "the carriers north of the Ohio river, by accepting less than their local charges on the traffic destined to Norfolk and Richmond and enforcing greatly higher charges, amounting in most instances to their local rates, for identically the same service, are largely responsible for this resulting discrimination against Wilmington; but it is not found that such carriers are altogether in fault. The rates south of Norfolk and Richmond on this traffic are also upon a high basis." And this seems to be a location of the discrimination, as before seen, and the only subject of complaint. As pointed out, the territory north and west of the Ohio river is in a sharply contested section for freights—in the "trunk line" territory, which has been extended to include Norfolk and Richmond, with their several competing carriers by rail and water—a geographic traffic and commercial advantage which Wilmington does not enjoy. The one favored more by natural and artificial (constructed) lines of traffic; both enjoying in proportion thereto their advantages over other points and cities having no water transportation or served by fewer lines of railroad. Courts and commissions must and do recognize these differences, as do carriers in fixing their freight rates. This court is not inadvertent to the rule as laid down by the Supreme Court in United States v. Moore, 95 U. S. 763, 24 L. Ed. 588, that "the construction given to the statute by those charged with the duty of executing it is entitled to the most respectful consideration, and ought not to be overruled without cogent reasons"; but the court is no less inadvertent to the rule laid down by the same authority to the effect that, when the government goes into one of its courts, it is entitled to no more consideration than any other litigant; and the fact that the statute requires proceedings of this character to be instituted in the courts for the purpose of enforcing the orders of the honorable Interstate Commerce Commission puts on the court an original, independent responsibility to due inquiry make, exercise its own judgment, and decide causes as they arise or are instituted. To issue the writ provided for in the act the court must be satisfied a case has been made out as for any other litigant in a court of equity. Recognizing the complainant herein as a co-ordinate branch of the government, created as an expert body for specific purposes, and with due deference for that honorable body, for reasons stated, and others not necessary to set out at length, this court is not satisfied there are not "cogent" reasons for a difference of opinion as to the rates discussed being unduly prejudicial to Wilmington and unduly preferential to Norfolk and Richmond and other Virginia cities. Personal and local attachments would incline this court to hold otherwise, but personal feelings, prejudices, or attachments should have no place

in the discharge of official duty—judicial, executive, or legislative—though they do in many instances have a potent influence; in some instances for good, frequently for evil. The reasons set out in the several pleadings and exhibits in the argument, and incidentally hereinbefore referred to, seem to be "cogent" reasons for the difference in traffic rates referred to, and for denying the writ asked for in the bill to enforce the order of the Interstate Commerce Commission. It is therefore considered, ordered, and decreed that the prayers of the bill numbered 5, 6, and 7, as follows:

"(5) That upon the final hearing hereof a decree may be entered granting to complainant a writ of injunction, or other proper process, mandatory or otherwise, to restrain the said defendants, and each of them, and their respective officers, servants, agents, from further continuing in their violation of and disobedience of the said order of commission.

"(6) That a decree may be entered requiring the said defendants, and each of them, to pay such sum of money, not exceeding the sum $500 for each day after a day to be named in such decree, that they shall respectively fail to obey the said injunction or other proper process.

"(7) That a decree may be entered requiring the said defendants to pay the costs of this proceeding and reasonable counsel fees,"

—Be, and the same are hereby, denied, and the bill herein be, and the same is, dismissed, with cost.