BALTIMORE & O. R. CO. et al. v. UNITED STATES.

(Commerce Court. November 15, 1912.)

No. 38.

CARRIERS (§ 32*)—INTERSTATE COMMERCE—REASONABLENESS OF REGULATIONS —LIGHTERAGE CHARGES IN NEW YORK HARBOR—DISCRIMINATION.

Petitioners, who are interstate railroad companies having eastern termini on the west side of New York Bay and the Hudson, established a lighterage zone, called the "lighterage limits," covering the greater part of the shore line of Greater New York, described in their tariffs, within which they perform lighterage service without additional charge, receiving and delivering freight at public and private wharves therein. They also maintain a number of public freight terminals within such limits, at which they deliver and receive freight, and to and from which its transportation is covered by their bills of lading. One of the largest of such terminals is on the East River in Brooklyn, known as the "Jay Street terminal," and consisting of a warehouse, yards, and tracks, used by petitioners jointly under contracts with the owners, who receive and deliver freight for petitioners, doing the loading, unloading, and lighterage between there and the rail terminals for a stated price fixed in the contracts. Such owners also operate a sugar refinery in the vicinity, a large part of the product of which passes through the terminal, being received there by petitioners and treated precisely as freight received from other shippers. Such shipments, however, constitute but a small percentage of the whole passing through such terminal. Respondent sugar refining company has its office in New York, but its plant is at Yonkers, 10 miles outside of the lighterage limits. It adopted a plan by which it ordered sugar purchased to go over petitioners' lines, loaded on lighters at the refinery, marked with the name and address of the purchaser, with shipping directions to deliver at its New York office. The lighter proceeded to a pier owned by the lighterage company on North River, within the lighterage limits, and there the master was given a form of bill of lading showing the company at its office address as the consignor, and directed to deliver the shipment to one of petitioners at its terminal on the west side of the bay, and on making delivery he obtained the signature of such petitioner's agent to the bill of lading. Held, that the fact that the owners of the Jay Street terminal were paid as such for handling and lightering their own product, after it had become the property of the purchasers by delivery to the carrier at such terminal, did not constitute the giving of a rebate in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, § 2, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3155), in the absence of any evidence that it was a device for that purpose; nor did it constitute the giving of an undue and unreasonable preference or advantage over respondent company, within section 3, because petitioners did not pay for the lighterage of respondent's shipments, since they were not in fact made from a point within the lighterage limits, the device of having the lighters stop on the way from Yonkers at a place within such limits, where respondent had no terminal facilities and made no tender of delivery, being a mere subterfuge, which gave it no legal or equitable claim to be a shipper from there.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

Mack, Judge, dissenting.

Petition by the Baltimore & Ohio Railroad Company and others, with the Brooklyn Eastern District Terminal, John Arbuckle, and Wil-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

liam A. Jamison, as intervening petitioners, against the United States, with the Interstate Commerce Commission and the Federal Sugar Refining Company as intervening respondents. Final hearing on motions to dismiss. Motion denied, and injunction granted.

For opinion of Interstate Commerce Commission, see 20 Interst. Com. Com'n R. 200.

George F. Brownell and H. A. Taylor, both of New York City, for petitioners.

Henry B. Closson, of New York City, and William N. Dykman, of Brooklyn, N. Y., for intervening petitioners.

Winfred T. Denison, Asst. Atty. Gen., of Washington, D. C., and Blackburn Esterline, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

Ernest A. Bigelow, of New York City, for Federal Sugar Refining Company.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Associate Judges.

CARLAND, Judge. The petition in this case was filed April 12, 1911, and seeks to have annulled and set aside an order of the Interstate Commerce Commission, dated March 6, 1911, the provisions of which are hereinafter stated. On April 19, 1911, upon its own petition, the Federal Sugar Refining Company was made a party defendant, with leave to appear and be represented by counsel. On May 11, 1911, the Interstate Commerce Commission and the Federal Sugar Refining Company filed a motion to dismiss the petition, for the reason that the facts set forth therein did not constitute a cause of action, and on the same day the Brooklyn Eastern District Terminal, upon leave granted, filed its intervening petition. On May 12, 1911, the United States filed a motion to dismiss, for the reason, among others therein stated, that the petition did not show there was any equity therein upon which to grant the relief prayed or any part of the same. On the same day the Jay Street Terminal and Arbuckle Bros., upon leave granted, filed their intervening petition. On May 17, 1911, upon motion of Mr. Blackburn Esterline, assistant to the Attorney General, it was ordered that the motion to dismiss the petition filed by the United States be extended to and considered as a motion to dismiss the intervening petition of Arbuckle Bros. and Brooklyn Eastern District Terminal, and upon motion of Mr. P. J. Farrell, counsel for the Interstate Commerce Commission, it was ordered that the motion to dismiss the petition filed by the Interstate Commerce Commission and the Federal Sugar Refining Company be extended to and considered as a motion to dismiss the intervening petition of Arbuckle Bros. and the Brooklyn Eastern District Terminal.

On May 17, 1911, the motions for a temporary injunction, made by the petitioners and intervening petitioners, and the motions to dismiss, came on for hearing before the court; and thereafter, on May

22, 1911, the motions to dismiss were by the unanimous decision of this court denied, with leave to the respondents making said motions to answer the petition of the petitioners within 20 days from said date, if they should be so advised; and on the same day the motions made for a temporary injunction were granted, and an order entered suspending the order of the Interstate Commerce Commission complained of until the further order of the court.

On June 12, 1911, the Federal Sugar Refining Company and the Interstate Commerce Commission prayed an appeal to the Supreme Court of the United States from the order or decree of the Commerce Court rendered on May 22, 1911, and assigned as one of the errors committed by this court that it erred in not dismissing the petition for want of equity. The appeal prayed for was allowed by this court on June 13, 1911. On June 16, 1911, the United States prayed an appeal to the Supreme Court of the United States from the order or decree of this court entered May 22, 1911, and assigned as error, among others, that the Commerce Court erred in not sustaining the motion of the United States to dismiss the petition and the intervening petitions. The appeal prayed for was granted by this court on the same day. On June 10, 1912, the Supreme Court of the United States affirmed the decree of this court entered May 22, 1911. 225 U. S. 306, 32 Sup. Ct. 817, 56 L. Ed. 1100.

On June 9, 1911, the Federal Sugar Refining Company filed its answer to the original petition; and on the same day the United States filed its answer to the original petition and also to the intervening petitions of Arbuckle Bros. and Brooklyn Eastern District Terminal. The Interstate Commerce Commission has never answered either of the petitions.

The mandate of the Supreme Court was filed in this court on June 24, 1912. On October 10, 1912, the United States and the Federal Sugar Refining Company, upon leave granted by the court, withdrew their several answers, and on the same day filed their motion to dismiss the petition of the petitioners, for the reason that the facts set forth in said petition did not constitute a cause of action or entitle said petitioners to the relief, or any of the relief, asked for by them in and by said petition. This action of the United States and the Federal Sugar Refining Company left the case standing upon the petitions of the petitioners, and the intervening petitioners, and the motions to dismiss of the respondent and intervening respondents Federal Sugar Refining Company and Interstate Commerce Commission. In this condition of the case the parties, by their counsel, appeared in open court and stipulated that the case be submitted to the court for final decision upon the merits on the petitions and motions to dismiss.

The material facts as they appear in the petitions are as follows:

The petitioning railroads are engaged in the transportation of passengers and property by railroad from one state to another, and all have rail termini upon the New Jersey shore of the harbor of New York, except the Baltimore & Ohio Railroad Company, whose rail terminus is at St. George, Staten Island, and the Pennsylvania Railroad Company, whose rail terminus for passenger traffic only is in the bor-

ough of Manhattan. In order to reach the shipping territory of Greater New York across the Hudson and East Rivers and other waters, petitioners have been compelled to serve the vast shipping interests of Greater New York by means of floats, lighters, and barges. Petitioners have established a lighterage zone, known as the "lighterage limits," which has been in effect for several years, and during that time has been and is now described in the tariffs of each of said petitioners, which tariffs have been and are duly filed with the Interstate Commerce Commission, as follows:

North River: New York side, Battery to 135th street; New Jersey side, Jersey City, N. J., to and including Ft. Lee, N. J.

East River and Harlem River: New York side, Battery to Jerome Avenue bridge, including Harlem River side of Ward's and Randall's Islands; Brooklyn side, from Pot Cove, Astoria, to and including Newtown and Dutch Kills creeks, and points in Wallabout Canal west of Washington Avenue bridge, and to Hamilton Avenue bridge, Gowanus Canal, to and including Sixty-Ninth street, South Brooklyn (Bay Ridge).

New York Bay: Points on north and east shore of Staten Island between Bridge creek (Arlington) and Clifton, both inclusive, and include Shooter Island; points on the New Jersey shore of New York Bay and on the Kill von Kull, between Constable Hook and Avenue C, Bayonne City, opposite Port Richmond, Staten Island.

Within said lighterage limits petitioners perform, without additional charge, a lighterage service on east-bound shipments from their rail terminals upon the western shore of New York Harbor to points within those limits, and on west-bound shipments from points within those limits to their rail terminals upon the western shore of New York Harbor.

Within said lighterage limits and at various points within the boroughs of Manhattan and Brooklyn, city of New York, each petitioner has established, and for several years has maintained, and still maintains, freight terminal stations, at which it delivers east-bound freight and receives west-bound freight for transportation over its lines. Each petitioner has some freight terminal stations, as aforesaid, which it owns and directly operates, and others which are operated for it under and pursuant to the provisions of certain contracts between it and the owners of said terminal stations. In some instances a single terminal station is operated for and on behalf of two or more of said petitioners under and pursuant to certain contracts between them and the owner of said station, and in such instances said terminal station is a union terminal for two or more of said petitioners. It is impossible for petitioners to deliver and receive all freight, especially carload freight, at said terminals. A large part of it must of necessity be delivered and received at public and private docks within the said lighterage limits. Accordingly, petitioners have for several years received and delivered freight at all steamship piers, docks, and landings, and private piers or landings when shippers or consignees arrange for the receipt or delivery of freight within the lighterage limits, and have lightered it without additional charge from and to said points, and still do so receive, deliver, and lighter it. Petitioners transport between said terminal stations, piers, docks, and landings and

their rail terminals on the western shore of New York Harbor, as a part of the transportation service from the points of shipment to the point of destination, and for the flat New York rate, by means of lighters, floats, and barges owned and directly operated by them, or operated for them under contracts between them and the owners of such equipment, freight received at or destined to said terminal stations, piers, docks, and landings.

Petitioners for several years past have held and now hold themselves out as common carriers to and from all said points within the lighterage limits, both by their practice of receiving and delivering freight at said points and by their tariffs, which are now and for several years past have been duly published and filed with the Interstate Commerce Commission. The liability under their respective bills of lading attaches to petitioners on west-bound shipments from the time the freight is received at such terminal station, dock, pier, or landing, and ends on east-bound shipments when delivered into the hands of the consignee at such terminal station, dock, pier, or landing. The bill of lading issued by petitioners for freight so received or delivered by them by its terms covers and includes the lighterage movement.

Among other terminal freight stations established by petitioners within the said lighterage limits is the Jay Street terminal. This terminal is located at the foot of Bridge street, Brooklyn, on the East River, having a water frontage of 1,200 feet and a depth of 600 feet. Its equipment consists of a large freight house, two Baldwin locomotives, three tugboats, two steam lighters, eleven barges, and nine car floats. The capacity of the yard is about 235 cars. The Jay Street terminal is a union freight terminal for all of said petitioners, and is designated as a regular public freight terminal of petitioners in their tariffs filed with the Interstate Commerce Commission. It is owned by a copartnership composed of William A. Jamison and John Arbuckle, conducting such freight terminal as a separate business under the name and style of "Jay Street Terminal," under certificate filed with the clerk of New York county in accordance with the law of the state of New York, and is operated as a freight station for petitioners under and pursuant to several contracts between petitioners and the Jay Street Terminal, which contracts are substantially identical in their terms and provisions. The material parts of one of said contracts and representative of them all, appears in the margin.[1]

[1] This agreement, made the fifth day of February, A. D. one thousand nine hundred and six, by and between Jay Street Terminal (hereinafter called Terminal Company), party of the first part, and Erie Railroad Company, party of the second part, witnesseth:

Whereas, the Terminal Company is the owner of premises in the borough of Brooklyn, city of New York, lying along and contiguous to the East River at a point east of Catherine Ferry, so called, and west of the United States navy yard, upon which there are now erected, or in process of erection, certain warehouses, bulkheads, docks and piers, railway tracks, and sidings, equipped or about to be equipped with suitable float bridges and approaches, and the usual appurtenances for receiving, handling, and delivering freights

The Jay Street terminal serves the shippers of a large and important manufacturing and shipping territory, including about one-third of the densely populated part of Brooklyn. It is the only convenient and accessible freight station of petitioners for the shippers of that territory. When it became necessary several years ago for petitioners to establish and operate public freight terminals for the service of said territory, they had no choice but to enter into a contractual arrangement with the owner of the Jay Street terminal for the operation of said terminal as a public freight station of petitioners. The price of the water front property in that section was so high as to be pro-

and for transporting same between said premises and the freight station of said Railroad Company located at Jersey City, N. J.; and

Whereas, the said Terminal Company is engaged in and will continue in the business of receiving freights at its said premises and carrying the same in both directions between its said premises and the said station of said Railroad Company and other carriers; and

Whereas, the said Railroad Company desires to avail itself of the facilities, conveniences, and services of the said Terminal Company in the transportation of freights, in both directions, between the said premises of said Terminal Company and the aforesaid freight station of the said Railroad Company:

Now, therefore, in consideration of the mutual covenants, promises, and agreements herein contained, the said parties do hereby covenant, promise, and agree to and with each other as follows:

First. The said Terminal Company will put and maintain its premises in good order and condition for the reception and delivery of such freights, and will provide tugboats, car floats, docks, piers, float bridges, and approaches adequate at all times to receive, discharge, transfer, and deliver such freights loaded or to be loaded in cars under this contract, and sufficient to accommodate the amount of business hereunder contemplated.

Second. Said Terminal Company will receive at the said float bridges of said Railroad Company at its aforesaid freight station, in cars to be placed upon its floats by said Railroad Company, all freights intended for delivery at the aforesaid premises of the said Terminal Company, and will safely carry the same to its said premises, and there make delivery thereof to the consignees. It will also receive and load into cars all freights which may be delivered to it at its said premises for transportation over the lines of said Railroad Company, and carry and deliver the same to said Railroad Company upon said Terminal Company's floats at the float bridges of said Railroad Company at its aforesaid freight station.

Third. The responsibility of said Terminal Company for eastwardly bound cars and the freights therein shall begin when the cars are placed upon its floats at the said float bridges at the aforesaid station of said Railroad Company, and shall continue as respects the cars until they have been returned by it, loaded or empty; and as respects the freights contained in eastwardly bound cars, its responsibility shall continue until the actual delivery thereof to and acceptance by the consignees at Brooklyn. As respects the freights to be transported west-bound, said Terminal Company's responsibility shall commence at the time the same is received from the consignor at its aforesaid premises, and shall continue until said freights, loaded into cars, have been brought to the float bridge of said Railroad Company at its aforesaid freight station and until the floats have been attached to the float bridge, and the cars are in complete readiness for removal from the car floats by said Railroad Company.

Fifth. The Railroad Company agrees to construct and maintain all necessary tracks, float bridges, approaches, and appurtenances at its said freight station to adequately carry out the purpose of this agreement.

Sixth. Said Railroad Company will pay said Terminal Company in full for all its services under this contract, as well as in full compensation for

hibitive. No independent terminals other than the Jay Street terminal were conveniently accessible to the shippers of that territory. In no other practicable way could petitioners in the past, nor can they at present, serve the large and important shipping interests of this section of Brooklyn than by the maintenance of the Jay Street terminal as a public freight station of petitioners under and pursuant to said contracts.

Arbuckle and Jamison operate a sugar refinery in the borough of Brooklyn, located upwards of a block from the Jay Street terminal. Shipments are carted from and to the terminal by Arbuckle and Jami-

all responsibility to be undertaken by it in respect to cars and freight, as follows:

(a) For all freights transported over said Railroad Company's railroad which shall have been received from its connecting lines west of trunk line western termini, on through rates, or for freight received by the said Terminal Company at its aforesaid premises and destined for transportation by said Railroad Company to points west of said western termini, on through rates, excepting grain in bulk, at the rate of four and one-fifth (4⅕) cents per hundred pounds. It is agreed, however, that whenever the allowance to Palmer's Dock on east-bound or west-bound rail and lake traffic or both is reduced from four and one-fifth (4⅕) cents to three (3) cents per hundred pounds, the same reduction shall be made in the allowance to Jay Street Terminal on rail and lake traffic. And it is also agreed that whenever the allowance for like service on such traffic to said Palmer's Dock or any other Brooklyn terminal is increased above the rates herein specified, the same increase shall be made in the allowance to said Jay Street Terminal on such traffic.

(b) For freight originating at or destined to any of the said western termini or points east thereof, or billed to or from said western termini at local rates, the allowance to said Terminal Company shall be three (3) cents per hundred pounds, whether or not the traffic reaches the terminal point through any other of said termini, it being understood that the western terminal points referred to are as follows: Suspension Bridge, Niagara Falls, Tonawanda, Black Rock, Buffalo, East Buffalo, Buffalo Junction, Salamanca, Erie, Pittsburgh, Allegheny, Bellaire, Wheeling, Parkersburg, Dunkirk.

(c) For "not to be graded" grain in bulk, for track delivery in the borough of Brooklyn, the rate shall be in three cents per hundred pounds.

(d) For freight which is rated per gross ton, either in official classification or in commodity tariffs, the allowance shall be three cents, or four and one-fifth cents per hundred pounds, regardless of the gross-ton rating.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Eleventh. Said Railroad Company agrees that during the continuance of this agreement the same rates of freight shall prevail from and to the premises of said Terminal Company that prevail from and to the regular freight stations of said Railroad Company in the borough of Manhattan, city of New York, excepting when coming from or going to points east of Susquehanna, in which case floatage shall be added in both directions, to which the Railroad Company shall be entitled.

Twelfth. Said Terminal Company will be responsible for and pay to said Railroad Company all freight moneys and charges as set forth in freight bills rendered by said Railroad Company for the transportation of east-bound freights delivered to it, and in like manner shall be responsible for and pay to said Railroad Company all moneys and charges which have been made payable in advance on west-bound freights, all of which payments shall be turned over to said Railroad Company in accordance with the latter's customary rules; and, if so required, the customary guaranteed bond shall be furnished by the said Terminal Company.

Thirteenth. Said Railroad Company will provide sufficient cars at all times

200 F.—50

son, and handled at the terminal in the same way as the freight of hundreds of other shippers, and the freight charges thereon are collected from said Arbuckle and Jamison by the Jay Street Terminal in accordance with the regularly published tariffs of petitioners. Approximately four-fifths of the shipments of sugar made by Arbuckle and Jamison through said Jay Street terminal are sold by said Arbuckle and Jamison f. o. b. Brooklyn and become the property of the consignees immediately upon delivery to the terminal. During the first six months of 1907 the bills of lading issued by the Jay Street Terminal for shipments of general merchandise numbered 92,622, of which 3,969 were for Arbuckle and Jamison sugar and 1,210 for Arbuckle and Jamison coffee, and the shipments and receipts of said Arbuckle and Jamison constituted less than one-third of the total tonnage moving through the terminal. During the same period the num-

for receiving and taking away the freights hereunder contemplated (unavoidable delay excepted), and to supply all the railway books and blanks necessary for the purpose of the business to be carried on under this contract, and with all reasonable dispatch to receive and take away from the said float bridges at its aforesaid station all the west-bound freights intended for transportation over its own lines and its connections.

Fourteenth. Said Terminal Company will insure and keep insured against loss by fire and marine risks all freights, cars, and property received by it upon its floats or its said premises under this contract so long as said freights, cars, or property shall remain in its possession, and until delivered to the consignees or to said Railroad Company as hereinbefore provided, including the time such freights, cars, or property shall be upon its lighterage line; and such insurance shall be for the benefit of said Railroad Company and others as their respective interests shall appear, and to an amount and in such manner as shall be satisfactory to said Railroad Company.

Fifteenth. Said Railroad Company will not during the continuance of this agreement. unless legally compelled to do so, establish or maintain any freight stations within the limits of said borough of Brooklyn between said Catherine Ferry and said United States navy yard. In case of any breach of this condition said Terminal Company may recover from said Railroad Company, and the latter shall pay to said Terminal Company damages at the rate of three dollars for each and every carload averaged at twenty thousand pounds, received or delivered or transported contrary to this provision.

Sixteenth. In case any east-bound freight consigned to stations of said Railroad Company in said city of New York other than the premises of said Terminal Company shall have its destination changed to the premises of the said Terminal Company and be delivered thereat, said Terminal Company will, at the request of said Railroad Company, collect from the consignee or forwarder the sum of three (3) cents per hundred pounds, and such three cents per hundred pounds shall be retained by said Terminal Company as full compensation for all services performed by it in such cases, and no other allowance shall be made under this contract in such case.

Seventeenth. Said Terminal Company will furnish said Railroad Company with a complete and accurate copy of each and all contracts made by it with other railroad companies during the term of this contract, and the Erie Railroad Company shall have and enjoy during the life of this contract all rights and privileges granted to any other railroad by said Terminal Company upon as favorable terms, with respect to allowances or otherwise, as granted to any other railroad company, anything herein to the contrary notwithstanding.

Eighteenth. This contract shall become operative and go into effect on the fifteenth day of February, 1906, and shall continue in force until March thirty-first, 1910; thereafter subject to termination upon ninety days' notice by either party.

ber of different consignees who received freight at the terminal was about 765, and the number of different shippers through the terminal about 560. The profits in the operation of the Jay Street terminal on all shipments during the same period amounted to less than 3 per cent. on the investment, without making any allowances for depreciation or interest.

The Federal Sugar Refining Company is a corporation of the state of New York, having its executive offices at 138 Front street, in the borough of Manhattan, and having its refineries from which it ships all its outbound products, including sugar, and at which it receives all its inbound supplies for the manufacture of sugar and commodities allied thereto, on the east bank of the Hudson River, within the corporate limits of the city of Yonkers, and more than 10 miles distant from the northernmost boundaries of the lighterage limits of petitioners. Said refineries are located on the line of the New York Central & Hudson River Railroad Company, with which they have switch connections, and over which the Federal Sugar Refining Company ships the greater part of its output and receives a large part of its inbound shipments. Over this railroad, with few exceptions, the rates to points in the shipping territory of the Federal Sugar Refining Company are the same as the rates from the Jay Street terminal over the lines of petitioners. In order to make shipments of its sugar from Yonkers via the lines of petitioners, at the New York rate, the Federal Sugar Refining Company must deliver such shipments to the New York Central & Hudson River Railroad Company at Yonkers, thence to be transported by that railroad to New York, and there delivered to petitioners at points within the lighterage limits. Because of alleged delay in the handling and transportation of such shipments via the route aforesaid, the Federal Sugar Refining Company prefers to deliver said shipments directly to petitioners by lighter within the lighterage limits. Prior to July, 1909, the Federal Sugar Refining Company of Yonkers, the predecessor of the Federal Sugar Refining Company, was accustomed to deliver its shipments at Yonkers to the Ben Franklin Transportation Company, which transported the same direct to the terminals of petitioners on the west shore of New York Harbor at a charge to the Federal Sugar Refining Company of Yonkers of three cents per hundred pounds.

In the month of May, 1907, the Federal Sugar Refining Company of Yonkers filed a complaint with the Interstate Commerce Commission against petitioners, alleging that the complainant, through the Ben Franklin Transportation Company, performed the same service on its shipments of sugar as were said to be performed by the Brooklyn Eastern District Terminal on shipments of the American Sugar Refining Company and by the Jay Street Terminal on shipments of Arbuckle and Jamison; that the lighterage limits prescribed by petitioners were unduly discriminatory, in that they did not extend to Yonkers and include the refinery of the Federal Sugar Refining Company of Yonkers, and permitted allowances to be made on shipments of sugar from the refineries of Arbuckle and Jamison and the American Sugar Refining Company, while not so permitting on the com-

plainant's shipments, because the latter was located outside the prescribed limits. This practice was said to result in unjust discrimination and to oblige complainant to pay unreasonable rates. Said complaint was answered by petitioners, and, after due hearing and consideration, the Interstate Commerce Commission dismissed said complaint, because the extension of petitioners' lighterage limits in New York Harbor was a matter of business discretion, and said Commission had no authority to require such extension beyond the then prescribed boundaries, and complainant, being located outside of the prescribed lighterage limits, was not subjected to unlawful discrimination by reason of the practice of petitioners in affording free lighterage on shipments originating at or destined to points within said lighterage limits, while refusing to so afford on complainants' shipments.

As a device to appear to ship from within the lighterage limits, within a month after the decision of the Interstate Commerce Commission above mentioned, a new corporation known as the "Federal Sugar Refining Company," was organized, which established its principal office at 138 Front street, New York City, and took over the refineries heretofore mentioned, in the city of Yonkers, and adopted the following practice: Contracts of sale or orders for sugar were received at 138 Front street, and each of said orders was given a separate contract number, and said order bearing the contract number was forwarded to the refinery, where the order was filled and the barrels or bags were stamped with the contract number and placed on a lighter. The shipment bearing the contract number remained intact until it reached the hands of the buyer. The refinery received shipping instructions from 138 Front street, and these shipping instructions showed the contract number, the ultimate destination, and the rail line over which the shipment was to be transported. The captain of the lighter of the Ben Franklin Transportation Company gave a receipt to the refinery, and received from the refinery a so-called bill of lading, which was a form of railroad bill of lading filled in by the Federal Sugar Refining Company, and designating a consignment to the Federal Sugar Refining Company, 138 Front street, New York City, to be transported by the Ben Franklin Transportation Company, and showing the contract number with which the shipment had been marked. This alleged bill of lading was not signed by the Ben Franklin Transportation Company through any of its officers, or the captain of the lighter, or by any other carrier. There was nothing in any of the documents which called for transportation to Pier 24, North River. The said shipping instructions sent from 138 Front street to Yonkers were to ship to "Federal Sugar Refining Company, 138 Front Street, City. B. F. T. Co. (B. & O.)"—or other initials representing the Ben Franklin Transportation Company and one of petitioners, as the case might be. None of the petitioners could or did perform any transportation service in connection with the Ben Franklin Transportation Company between Yonkers and 138 Front street, and such shipping instructions were in fact directions to deliver said shipments to the Ben Franklin Transportation Company to be lightered and delivered to one of petitioners at its terminal on the west shore of New York Harbor. The practice was for the lighter of the Ben Franklin Transportation Company to

go to Pier 24, North River, New York, part of which pier is leased to the Ben Franklin Transportation Company, where the captain of the lighter called up the office of the Federal Sugar Refining Company at 138 Front street and reported the particular shipment then on his lighter. The captain of the lighter was then handed a form of bill of lading not signed by any of petitioners and showing the name and address of the consignor as the Federal Sugar Refining Company, 138 Front street, New York, Franklin Street Pier 24, North River. The lighter then proceeded to the rail terminus of such petitioners as had been previously designated in the shipping instructions sent to Yonkers, and there delivered the shipment to such petitioner and obtained the signature of petitioner's agent at said terminus upon the form of bill of lading theretofore prepared and delivered to said captain as aforesaid, and said bill of lading was stamped by said petitioner's agent to show the receipt of the shipment at said station on the west shore of New York Harbor.

Such shipments were handled under contract between the Ben Franklin Transportation Company and the Federal Sugar Refining Company for a compensation of three cents per hundred pounds, although the contract provides for a compensation of four cents per hundred pounds on sugar lightered from Yonkers to Pier 24, North River, payments for said service being made to the Ben Franklin Transportation Company under that provision of said contract which provides for a compensation of three cents per hundred pounds for sugar lightered from Yonkers to petitioners' rail termini.

Having established the practice above described, the said Federal Sugar Refining Company filed a complaint in October, 1909, with the Interstate Commerce Commission against petitioners. Said complaint alleged, in substance, that the interstate transportation of the product of the said Federal Sugar Refining Company began at Pier 24, North River, borough of Manhattan, a point within the lighterage limits as aforesaid, and that said Jay Street terminal is owned and conducted by copartners, named John Arbuckle and William A. Jamison, which said copartners owned, maintained, and operated in connection therewith a sugar refinery at the foot of Jay street, borough of Brooklyn; that said amounts of three cents per hundred pounds and four and one-fifth cents per hundred pounds were paid to said copartners for the lightering of their sugar from Jay street, Brooklyn, to the rail termini of petitioners on the west bank of New York Harbor, and that inasmuch as the said Federal Sugar Refining Company was a competitor of the said Arbuckle and Jamison in the sugar business, it constituted an undue and unreasonable prejudice and disadvantage against said Federal Sugar Refining Company to pay said amounts of three cents and four and one-fifth cents per hundred pounds for the handling of sugar to said Arbuckle and Jamison, and not to pay similarly to the said Federal Sugar Refining Company. Hearings were had before the Interstate Commerce Commission upon the last-mentioned complaint, and subsequently the Commission issued its order against petitioners in the following language:

It is ordered that the above-named defendants be, and they are hereby, notified and required to cease and desist, on or before the 15th day of April,

1911, and for a period of not less than two years thereafter abstain, from paying such allowances to Arbuckle Bros. on their sugar while at the same time paying no such allowances to said complainant on its sugar, which said allowances so paid to said Arbuckle Bros. by said defendants are found by the Commission in said report to be unduly discriminatory and in violation of the act to regulate commerce.

The leave granted by this court allowing the United States and the Federal Sugar Refining Company to withdraw their answers and file motion to dismiss undoubtedly entitles them to be again heard as to whether the petition states a cause of action, although the record thus presented is a novel one. We certainly are in no position, after having denied the motions to dismiss, and after the Supreme Court has affirmed our action, so far as the granting of the temporary injunction is concerned, to now hold upon the same facts that the petitions do not state facts sufficient to constitute a cause of action, merely because the case is now submitted for final decision. We are of the same opinion, however, as when we denied the motions to dismiss on May 22, 1911; but, as we did not at that time give the reasons which impelled us to make the decision then rendered, we can now with propriety state them.

The Interstate Commerce Commission in its report and order did not specify whether it found a violation of section 2 or section 3 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3155]). These sections read as follows:

Sec. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. * * *

The language used by the Commission would lead to the inference that it found a violation of section 3. If the facts pleaded, however, show a violation of either of the above sections, the order must be sustained, and it must also be sustained if based upon a finding of fact, which we are not at liberty to review. In the first place, the case must be freed from matters which cloud the real issue. It is continually suggested that the arrangement between petitioners and the Jay Street Terminal may be a scheme to cover a rebate. We are not permitted to base our judgment on suspicion, but upon facts pleaded and proven. Respondents have been given ample opportunity to produce all evidence within their power for the purpose of showing that the payments made by petitioners to the Jay Street Terminal constitute

unlawful rebates, but no such evidence has been produced. On the contrary, respondents withdrew their answers and now ask the court to decide the case upon the facts stated in the petition. Surely upon this record the court ought to be relieved of presuming that the contracts made by petitioners with the Jay Street Terminal are a cover for the payment of unlawful rebates.

Again, the performance of the Ben Franklin Transportation Company at Pier 24, North River, is a play in which the episode is lost in the dénoucment. It is a plain device and subterfuge indulged in on behalf of the Federal Sugar Refining Company for the purpose of making it seem that sugar, which is being lightered from Yonkers, N. Y., 10 miles north of the lighterage limits established by petitioners, was in fact shipped from Pier 24 by a delivery of the same at that point to the petitioners, when the uncontradicted record, as admitted by the motions to dismiss, shows that the petitioners have nothing to do with the sugar of the Federal Sugar Refining Company until it reaches the New Jersey shore and is there delivered to petitioners. Courts of equity, looking through mere forms to the substance of things, cannot, nor ought they be asked to, found their judgment upon a plain subterfuge. No sugar is tendered by the Federal Sugar Refining Company to petitioners at Pier 24. On the contrary, the Ben Franklin Transportation Company, acting for the Federal Sugar Refining Company, refuses to tender it there and allow it to be taken by petitioners, but insists upon transporting it itself to the rail termini. The statement of facts makes it plain that the Federal Sugar Refining Company transports its sugar direct from Yonkers to the Jersey shore, and we must find as a matter of law that the transportation of Federal sugar by petitioners does not commence until it is delivered to them at their rail termini. The facts do not bring the case within the ruling of the Supreme Court in Gulf, Colorado & Santa Fé Railway Company v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540.

We must indulge in the presumption that the Commission found nothing unlawful in the payments made by petitioners to the Jay Street Terminal under the facts appearing in the record, or it would not have framed its order in the alternative. Penn Refining Co. v. W. N. Y. & P. R. R. Co., 208 U. S. 208, 28 Sup. Ct. 268, 52 L. Ed. 456; East Tenn., etc., R. R. Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719; Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 190 U. S. 273, 23 Sup. Ct. 687, 47 L. Ed. 1047; Louisville & Nashville R. R. Co. v. United States, 197 Fed. 58–60.

There can be no doubt as a matter of law under the facts admitted that transportation by petitioners of freight delivered to them at the Jay Street terminal commences at said terminal, and that the services performed by the Jay Street Terminal are transportation services. In our disposition of the case we make no distinction between the Jay Street Terminal and Arbuckle Bros., but treat them as the same entity in legal effect. It then appears that petitioners under their respective contracts are paying the Jay Street Terminal for a terminal service

and also for the transportation of freight from the terminal to the Jersey shore. Providing this charge is reasonable, and there is no suggestion that it is not, we understand the law to permit such payment. Central Stockyards Co. v. L. & N. Railway Co., 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565; R. R. Com. of Ky. v. L. & N. Railway Co., 10 Interst. Com. Com'n R. 173; Cattle Raisers' Ass'n v. C., B. & Q. R. R. Co., 11 Interst. Com. Com'n R. 277; section 15, act to regulate commerce, as amended (Act June 18, 1910, c. 309, § 12, 36 Stat. 551 [U. S. Comp. St. Supp. 1911, p. 1297]); Central Stock Yards Co. v. L. & N. Ry. Co., 118 Fed. 113, 55 C. C. A. 63, 63 L. R. A. 213, affirmed 192 U. S. 568, 24 Sup. Ct. 339, 48 L. Ed. 565; Covington Stock Yds. Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 469, 35 L. Ed. 73; Butchers' & D. Stock Yds. Co. v. L. & N. R. R. Co., 67 Fed. 35, 14 C. C. A. 290; United States v. Delaware, L. & W. Co. (C. C.) 40 Fed. 101; Consolidating Fordg. Co. v. Southern P. Co. et al., 9 Interst. Com. Com'n R. 182; Excursion Car Co. v. Penn. R. Co., 3 Interst. Com. Com'n R. 577; In re Transportation of Fruit, 10 Interst. Com. Com'n R. 360; F. H. Peavey Co. v. Union Pac. R. Co. (C. C.) 176 Fed. 409, affirmed 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83; Interstate Commerce Commission v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83.

This case is in no way parallel to the case of Union Pacific Railway Co. v. Updike, 222 U. S. 215, 32 Sup. Ct. 39, 56 L. Ed. 171. The Jay Street terminal is one of the public terminals of petitioners, and it is owned by Arbuckle Bros. The payments made by petitioners to the Jay Street Terminal are for the terminal and transportation services performed by it in connection with all freight shipped from or delivered to said Jay Street Terminal. It so happens that Arbuckle Bros., who own and operate the terminal, also are shippers, and only in this way can it be said that they receive payment for transporting their own sugar. In order to make the case parallel to the Updike Case, it would have to appear that the Federal Sugar Refining Company also owned and operated for petitioners a public terminal for the receipt and delivery of freight within the lighterage limits, and that the Federal Sugar Refining Company had sugar of its own which it transported to the rails of petitioners together with other freight. If the case stood in such position, under the Updike Case it might be necessary to hold that the petitioners must make the same payments to the Federal Sugar Refining Company as to Jay Street Terminal. But the always present fact is that the Federal Sugar Refining Company does not own and operate any public terminal for petitioners, nor does it transport a pound of sugar from any terminal within the lighterage limits to the rail termini of petitioners. There is no room for the court to enforce equality between Arbuckle Bros. and the Federal Sugar Refining Company as to payments for the transportation of their sugar, for the reason that the position in which the court finds the respective parties to the controversy will not permit. We find Arbuckle Bros. owning the Jay Street terminal, used as a public terminal of petitioners within the lighterage limits. We find the Federal Sugar Refining Company, with its refinery at Yonkers, 10 miles north of the

lighterage limits, owning and operating no public terminal for petitioners, and tendering petitioners no freight at any of their public terminals. So that we cannot see how any violation of either section 2 or section 3 can be predicated of the facts stated in the record.

But it is claimed that this is true: That it costs the Federal Sugar Refining Company three cents per hundred pounds more to get its sugar to the Jersey shore than it does Arbuckle Bros. This could be avoided in part if the Federal Sugar Refining Company would tender its sugar for shipment over the rails of petitioners at any of the terminals of petitioners within the lighterage limits, many of which are much nearer Yonkers than the Jay Street terminal or even Pier 24, North River. And we must not forget in this connection that the Federal Sugar Refining Company voluntarily located its refinery at Yonkers, and if it thereby has subjected itself to some natural disadvantage it cannot call upon the courts to remedy it. The Commission recognized this fact when it refused to compel petitioners to extend their lighterage limits so as to include the Federal sugar refinery. It is apparent from the record that the sole disadvantage of the Federal Sugar Refining Company results from its location outside the lighterage limits, and that it is in no way injured or prejudiced by the fact that Arbuckle Bros. own the Jay Street terminal.

For the reasons above stated, we are of the opinion that the order of the Commission was in excess of its power, and that it ought to be permanently suspended and enjoined; and it is so ordered.

MACK, Judge (dissenting). The Commission in its report does not clearly indicate whether it deems the transportation of the Arbuckle sugar to begin in New York or in Jersey City. It is conceded by counsel that this is a question of law to be determined by this court. As to goods shipped by Arbuckle Bros. to others than themselves as consignees, there would seem to be no room for doubt, for whatever may be the liability of the Jay Street Terminal toward such consignees, clearly the railroad companies are liable to them as common carriers at the latest from the time of the delivery of the goods into the cars and the issuance of the bill of lading in their name by their authorized agents in New York. I concur in the conclusion of the majority of the court that this transportation begins in New York.

As to the comparatively small percentage of shipments of which Arbuckle Bros. are the consignees as well as the consignors, this would seem to be equally true. The title thereto could be transferred by them immediately after the bills of lading are issued, and in that event the railroad companies would again clearly be liable as carriers to the assignees, even though the goods had not yet actually moved from New York. And the retention of title thereto by Arbuckle Bros. during the time that they, acting as agents for the railroad companies, are transporting them to Jersey City under the contract by which they agree to indemnify the railroad companies against their own acts, and thereby to release them, in a sense, from the obligations which they would ordinarily incur as common carriers toward the owners of goods carried, would not of itself change the transaction from a trans-

portation service performed by the railroads through their agents, the shippers, into an accessorial service performed by the shippers solely on their own account, payment for which would be illegal, irrespective of any unjust discrimination that might result therefrom.

I concur, too, in the opinion of the majority of the court that Arbuckle Bros. and the Jay Street Terminal are to be treated as identical. When two individuals form two firms in which each is interested in the same proportions, the one to refine sugar, and the other to operate a terminal station and to transport goods for railroads, the two firms do not thereby become so distinct and separate for every purpose as to legalize a payment to the latter firm for carrying the former's product, if such payment would be illegal as unjustly discriminatory when made directly to the former firm. The Commission was therefore fully justified in this case in dealing with the two firms as one.

The question before this court then is: Could the Commission reasonably find that payment to Arbuckle Bros. for getting sugar manufactured by them from a point within the lighterage limits to Jersey City—that is, for performing a part of the railroad companies' transportation service (a payment permitted by section 15 of the act, subject to regulation by the Commission as to its reasonableness)—would operate as an unjust discrimination against the Federal Sugar Refining Company unless a similar payment were made to the latter company for getting sugar manufactured by it from another point within the lighterage limits to Jersey City?

If the Federal Company had its refinery at Pier 24, and if Arbuckle Bros. operated their wharf only as a private and not as a public station, and if the allowance made to them for carrying their sugar to Jersey City were no more than the bare cost of the service, the Commission would be justified in finding that a refusal to make a similar allowance to the Federal Company and the offer to give it in lieu thereof free lighterage of its sugar would result in an unjust discrimination against the Federal Company. Union Pacific Railroad Co. v. Updike Grain Co., 222 U. S. 215, 32 Sup. Ct. 39, 56 L. Ed. 171.

Do the facts, first, that the Federal Company's refinery is at Yonkers, that it brings its goods to Pier 24 primarily or solely to get them within the lighterage limits, that it has never demanded and does not want free lighterage from Pier 24, and that as a result thereof the transportation of its goods by the railroads begins in Jersey City, or, second, that Arbuckle Bros. are employed by the carriers to operate their wharf as a public terminal station, and to transport therefrom to Jersey City not only their own, but others', goods, necessarily render the circumstances such that the Commission in the reasonable exercise of its powers could not find them to be substantially similar?

(1) If this case were based on the grant of free lighterage to Arbuckle Bros. and the failure to grant it to the Federal Company, the latter would, of course, have no ground for complaint, unless it really wanted and offered to avail itself of such free lighterage. But when, as here, the complaint is based on the grant to the one and the denial

to the other of the privilege, not of free lighterage, but of itself performing for compensation the transportation service from within the lighterage limits to Jersey City, it is no answer to assert that at present the situation of the two parties is not similar; transportation for the one beginning at New York and for the other at Jersey City. The charge is that this dissimilarity is due, not to the voluntary act of the parties, but to the very discrimination sought to be removed as unjust, and that if the same privilege were granted the Federal Company as is granted Arbuckle Bros.—that is, to transport its goods from a point in the lighterage limits to Jersey City in its own or hired lighters, not at its cost, but as the compensated agent of the railroads—it would be ready, willing, and able so to do.

If this court must find that there is no substantial basis for the Commission's view that the Federal Company was shipping, and, on a grant of like privileges to those accorded Arbuckle Bros., would be ready to ship from Pier 24, if the facts stated in the petition necessarily lead to the conclusion that the shipment is and would be direct from Yonkers, a point without, and not from Pier 24, a point within, the lighterage limits, to Jersey City, there would be an end of the case. I am of the opinion, however, that this court should not so hold.

The railroads are not concerned with the history of goods offered for transportation. Interstate Commerce Commission v. D., L. & W. R. Co., 220 U. S. 235, 31 Sup. Ct. 392, 55 L. Ed. 448. If parties are ready to perform for compensation that part of the service which the railroad companies, by their offer to begin the carriage in New York, instead of in New Jersey, have made transportation service, it cannot be material to the railroads how the goods get to the point where this service is to begin—whether it be by rail, barge, or wagon. The goods are to be tendered to them at that point. The only transportation with which we are here concerned, that by the railroads, is to begin there.

The barge that brings the Federal Company's sugar from Yonkers is tied up to the dock at Pier 24. The sugar is then just as much within the lighterage limits as if it were dumped out on the pier. When the barge is so tied up, a shipper who wants to avail himself of the free lighterage offer could assuredly do so. The railroads make this offer to the Federal Company now, an offer which would be illegal if the goods could not be considered to be within the lighterage limits, and if the interstate transportation necessarily began at Yonkers. If the refinery were situated in New York City, a few blocks off the water front, on a small canal or creek large enough only for rowboats, the company clearly could bring its goods by such a boat to the dock and put them on lighters, without first dumping them onto the dock.

Of course, at the present time, the Federal Company cannot offer the goods to the railroads at Pier 24. As it does not want free lighterage, and as the railroads will not accept them at Pier 24 by issuing, through regular agents, or through the Federal Company itself, acting as their agent, the necessary bills of lading, and permitting the Federal Company as their paid agent thence to transport them to Jersey City under covenants similar to those found in the Jay Street Terminal

contracts, it would seem to be utterly useless for the Federal Company to do anything more than it is doing. It says:

"Our sugar is at Pier 24. It is already loaded in lighters. We want bills of lading for the through transportation from this point, and we demand, for similar compensation, the privilege of performing a part of the transportation service, that between the lighterage point, Pier 24, and Jersey City, a privilege substantially similar to that which you grant Arbuckle Bros."

In the opinion filed by the Commission in the original case brought by the Federal Company, involving only the extension of the lighterage limits and based primarily on an alleged violation of section 3 of the act, importance was attached to the concession of counsel that the Federal Company would not be any better off if the Jay Street terminal were owned by the railroad companies, with the implication that in that event the allowance would be cut off and only free lighterage granted. The refinery at Yonkers would, of course, always be under the disadvantage of having to bring its goods to Pier 24.

The present proceeding, however, was brought by the Federal Company, not in the capacity of a Yonkers refinery, primarily to prevent, as between localities, the undue prejudice forbidden by section 3, but in its capacity of a vendor and shipper of sugar from Pier 24, primarily to prevent as against it the unjust discrimination forbidden by section 2 of the act. Only in that capacity is it to be dealt with in this case, and therefore it is immaterial how, whence, or at what cost it gets its sugar to that pier.

(2) Can parties guilty of what would otherwise be an unjust discrimination escape the consequences of their act by combining the payment for the transportation service with payment for other work that in and of itself has no necessary connection therewith?

That Arbuckle Bros. run a public wharf as agents of the railroad companies, that their compensation is a combination of rent and wages as terminal managers and transporters, that the amount paid per 100 pounds for sugar may be far beyond a fair payment for that particular service, and may be made so because a similar payment per 100 pounds may be far below a fair payment for similar services as to other goods, do not, in my judgment, necessarily render the circumstances surrounding the transportation of the sugar to Jersey City so dissimilar from those at Pier 24 as to justify this court in holding that the Commission, in the reasonable exercise of its powers, could not find that an unjust discrimination resulted from the payment to Arbuckle Bros. and the refusal to make a similar payment to the Federal Company. If the Commission could reasonably so find, its order cannot be annulled merely because the members of this court might have reached a different conclusion, had they been acting as commissioners.

The fact that the contracts between the Jay Street Terminal and the railroads, by which the Arbuckle private docks were made public terminal stations and these allowances were definitely fixed, were made during the session of Congress which enacted the Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1911, p. 1284]), a law which aimed more effectively to prevent certain illegal practices theretofore secretly indulged in for the benefit of large and

favored shippers, and the further fact that the ultimate destination of the goods determined the rate of payment, although the services in each case were absolutely identical, lends support to the conclusions of the Commission that the allowances are a mere disguise to conceal unjustly discriminatory and therefore illegal payments.

In my judgment, the petition should be dismissed for want of equity.