TEXAS & P. RY. CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

(Commerce Court, April 25, 1913.)

No. 68.

**1. COMMERCE (§ 85\*)—INTERSTATE COMMERCE COMMISSION—POWERS—DISCRIMINATION BETWEEN LOCALITIES.**

The proviso in Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), that the act shall not apply to transportation wholly within one state, is a mere disclaimer of any intention on the part of Congress to exceed its constitutional power, and was not designed to limit the provisions that are within the power which Congress could exercise, and the proviso does not prevent the application of the third section in prohibiting undue discrimination between localities to cases where such discrimination is brought about by state action, requiring a reduction in intrastate rates.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.\*]

**2. COMMERCE (§ 85\*)—INTERSTATE COMMERCE COMMISSION—POWERS—DISCRIMINATION BETWEEN LOCALITIES.**

Though the preference given to one locality or the disadvantage to which the other is subjected is not due to the voluntary act of the carrier, and although the interstate rates in force may be reasonable in themselves, the Interstate Commerce Commission can correct the discrimination by requiring a just equalization in rates between the two localities.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.\*]

**3. COMMERCE (§ 8\*)—STATE REGULATION OF RATES—VALIDITY—INTERFERENCE WITH INTERSTATE COMMERCE.**

The right of a state to control the movement of its internal commerce, and the instrumentalities employed in such movement, is not unlimited, and the action of a state in reducing railroad rates on intrastate shipments below what is justly compensatory to the carriers, with the purpose and effect of securing unjust and arbitrary advantage to dealers within the state over competitors in other states, directly affects interstate commerce, and encroaches on the field in which federal authority is supreme and exclusive, and the rates so made cannot be held binding upon the carriers affected.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.\*]

**4. POWER OF INTERSTATE COMMERCE COMMISSION OVER INVOLUNTARY RATES.**

While Congress may constitutionally confer upon the Interstate Commerce Commission the power to prevent an undue prejudice between communities, resulting from varying interstate and intrastate rates, even though one or the other be not voluntarily established, such power has not yet been granted. Such an order cannot be based upon a compelled rate, whether interstate or intrastate, and whether compelled by competition, by statute, by court decree, or by order of a commission. (Per Mack, J.)

**5. VOLUNTARY ACQUIESCENCE IN COMPELLED RATES.**

The present order can be upheld only upon the theory that the failure of the railroads to attack the Texas Commission rates was due to their voluntary or negligent acquiescence therein, and that therefore these rates may be deemed to have been voluntarily made by the railroads. (Per Mack, J.)

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Petition by the Texas & Pacific Railway Company against the United States of America, in which the Interstate Commerce Commission, the Railroad Commission of Louisiana, the St. Louis Southwestern Railway Company, and others intervene. On final hearing. Petition dismissed.

For opinion of Interstate Commerce Commission, see Meredith v. St. Louis Southwestern Ry. Co., 23 Interst. Com. Com'n R. 31.

Henry G. Herbel, of St. Louis, Mo. (Fred G. Wright, of St. Louis, Mo., on the brief), for petitioner.

Winfred T. Denison, Asst. Atty. Gen. (Thurlow M. Gordon, Sp. Asst. Atty. Gen., on the brief), for the United States.

P. J. Farrell, of Washington, D. C., for Interstate Commerce Commission.

Luther M. Walter, of Chicago, Ill. (R. G. Pleasant, Atty. Gen., and W. M. Barrow, Asst. Atty. Gen., on the brief), for Railroad Commission of Louisiana.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Judges.

KNAPP, Presiding Judge. The question to be decided in this case has been so thoroughly discussed by the Commission, and kindred questions have been so fully considered in various cases recently decided or now pending in other courts, that little can be profitably said beyond a statement of our conclusions.

There is no dispute about the material facts, and they are easily comprehended. The interstate rates of petitioner from Shreveport, La., to Dallas, Tex., and intermediate points on its line, are very much higher in proportion to distance than the state rates of petitioner from Dallas to the same intermediate points in the state of Texas. For example, the rate on farm wagons from Shreveport to Marshall, a distance of 42 miles, is 56 cents per 100 pounds, while the rate from Dallas to Marshall, a distance of 147 miles, is only 36.8 cents. Under such an adjustment of freight charges it is obvious that Shreveport is severely, if not fatally, handicapped in its competition with Dallas for the trade of the intervening territory, most of which is situated in the state of Texas. It appears that operating conditions are substantially the same throughout the entire line and in both directions between these two cities, and petitioner makes no claim that the disparity in rates can be justified by differences in the cost of transportation. Indeed, it seems to be conceded—and certainly no other inference is permissible—that the rate situation here in question would clearly constitute undue prejudice to Shreveport and undue preference to Dallas, within the meaning of the third section of the act (Act Feb. 4. 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), provided that section be applicable, if the intrastate rates from Dallas, like the interstate rates from Shreveport, were voluntarily established by the carrier. But while the discrimination in fact against Shreveport is admitted, the contention is made that as matter of law it is not and cannot be undue, or otherwise in violation of the act, because the intrastate rates in question are made by authority of the state of Texas,

and the petitioner is under legal compulsion to observe them. In other words, it is insisted that a violation of the third section cannot be predicated upon a rate relation, however unjust, which is brought about, not by the voluntary action of the carrier, but by the command of a state which the carrier is constrained to obey.

In this suit the order of the Commission is sought to be set aside only so far as it affects commodity rates, and the Commission has found, in effect, that petitioner's interstate commodity rates from Shreveport to these Texas destinations are reasonable rates for the service rendered; that is, rates which conform to the requirements of the first section of the act, and which, therefore, petitioner may justly and lawfully charge. From this finding, in connection with other facts stated, it seems necessarily to follow that the intrastate commodity rates of petitioner from Dallas to the same destinations, which the Texas Commission has prescribed, are materially less than petitioner is justly entitled to charge; and this involves the further consequence that the Texas Commission, by imposing upon petitioner lower rates than it should rightfully receive, has, in point of fact, placed an undue burden upon interstate commerce, and thereby obstructed the freedom of its movement. If this is a correct analysis of the situation, as is virtually admitted, it can hardly be doubted that the action which produces such a result, whether intended or otherwise, is in derogation of the power and authority of Congress under the commerce clause of the Constitution.

The right of a state to control the movement of its internal commerce and the instrumentalities employed in such movement is not unlimited, as the Supreme Court has repeatedly declared. In the first case which involved the scope and meaning of the commerce clause, Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, the line of demarkation between state and federal power was defined by Chief Justice Marshall in the following language:

"It is not intended to say that these words [commerce among the states] comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to *or affect* other states. Such a power would be inconvenient, and is certainly unnecessary. Comprehensive as the word 'among' is, it may very properly be restricted to *that commerce which concerns more states than one.* * * * The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, *and to those internal concerns which affect the states generally,* but not to those which are completely within a particular state, *which do not affect other states,* and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." (Italics ours.)

This definition has been uniformly accepted and the language itself quoted with approval in a number of cases. The Daniel Ball, 10 Wall. 557, 565, 19 L. Ed. 999; The Lottery Cases, 188 U. S. 321, 346, 23 Sup. Ct. 321, 47 L. Ed. 492; The First Employers' Liability Cases, 207 U. S. 463, 493, 28 Sup. Ct. 141, 52 L. Ed. 297. And quite recently, in The Second Employers' Liability Cases, 223 U. S. 1, 54, 32 Sup. Ct. 169, 177 (56 L. Ed. 327, 38 L. R. A. [N. S.] 44), Mr. Justice Van Devanter, after quoting to the same effect from McCulloch v. Mary-

land, 4 Wheat. 426, 4 L. Ed. 579, remarks that "particularly apposite is the repetition of that principle in Smith v. Alabama," 124 U. S. 465, 473, 8 Sup. Ct. 564, 566 (31 L. Ed. 508), where it is stated as follows:

"The grant of power to Congress in the Constitution to regulate commerce with foreign nations and among the several states, it is conceded, is paramount over all legislative powers which, in consequence of not having been granted to Congress, are reserved to the states. It follows that any legislation of a state, although in pursuance of an acknowledged power reserved to it, which conflicts with the actual exercise of the power of Congress over the subject of commerce, must give way before the supremacy of the national authority."

In the light of these decisions, and many others of similar import, it seems clear to us that Congress is invested with ample power to prevent or remove such a discrimination as is here considered. This is not seriously disputed by petitioner, as we understand the position of counsel; but the contention is pressed that Congress has not exerted its power, even if the power be possessed, to the extent necessary to reach this particular kind of discrimination, and therefore the Commission's order should be set aside because in excess of its authority.

The power which Congress has exercised in this regard finds expression in the third section of the act to regulate commerce, as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

It would be difficult to frame a more comprehensive and unqualified declaration. It applies to all interstate railroads and makes unlawful every act which operates to the undue prejudice of any locality. Taken by itself, and giving to the language used its natural significance, the paragraph quoted brings within its condemnation the rate adjustment here involved, because that adjustment as a matter of fact is obviously prejudicial to the shipping interests of Shreveport. And it would follow from this view of the section that the Commission had authority to correct the ascertained injustice by making the order sought to be enjoined. The opposing view is based upon two general grounds which present the real controversy in this case, and which will now be briefly examined.

[1, 2] In the first place, it is said that the provisions of the third section, above quoted, are to be read in connection with the proviso in the first section, and that this proviso defines and limits the power which Congress intended to exercise by expressly excluding transportation "wholly within one state." In other words, the proviso is claimed to be an exception which exempts from regulation under the act the rates on intrastate traffic, and therefore deprives the Commission of authority to found a violation of the statute upon the relation between state

and interstate rates, no matter what may be the effect of that relation upon the movement of interstate traffic. The proviso reads as follows:

"Provided, however, that the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property wholly within one state and not shipped to or from a foreign country from or to any state or territory as aforesaid."

The intent and meaning of this proviso has been quite fully discussed by this court in Denver & R. G. R. Co. v. Interstate Com. Com'n, 195 Fed. 968, and a conclusion therein reached substantially adverse to the contention here considered. In that case we said:

"Section 1 not only subjects to the act, first, certain carriers, but also, second, certain transportation. The proviso relates, not to the carriers, but to the transportation, and is therefore to be read in connection with the second clause of the section, and not with the first. * * *

"Then, out of abundant caution, as it seems, and by way of disclaimer of any authority over a carrier that confined its business to one state, and was not engaged in such interstate business as would bring it within the first clause, the proviso was added. * * *

"The proviso, therefore, must be regarded as a disclaimer, and not as an exception. It could not, of course, be an exception to the second grant of jurisdiction over certain transportation, and it does not in any way refer to the first grant of jurisdiction over certain carriers, either by way of disclaimer or by way of exception. * * *

"This construction gives consistent and appropriate meaning to those provisions of the first section which define the scope and application of the entire enactment. It sustains the act as a comprehensive scheme of regulation, designed to include all interstate transportation wholly by railroad, or partly by railroad and partly by water, when both are used under a common arrangement, *and to exempt only that intrastate transportation which is not within the power of Congress to regulate.*"

Adhering to the views then expressed, which are summed up in the last paragraph quoted, we hold that this proviso is a ·mere disclaimer of any intention on the part of Congress, in enacting the act to regulate commerce, to exceed its constitutional power, and that it was not designed to limit or confine the power which Congress could exercise—and, in our opinion, has exercised—in respect of such matters as are here in dispute. If this construction be correct, it follows that the proviso in no way prevents the application of the third section to the facts of this case, and therefore it was within the authority of the Commission to make the order in question.

It is argued in the second place, as above stated, that the "undue preference" and "undue prejudice" which are declared unlawful by the third section of the act, as that section has been construed by the Supreme Court, can be predicated only upon the voluntary action of the carrier, and therefore the lower rates from Dallas than from Shreveport are not in violation of the third section, whatever may be the resulting disadvantage to Shreveport shippers, because such lower rates are not voluntarily accorded but are imposed upon petitioner against its will by the Texas Commission.

This contention is based upon several decisions of the Supreme Court, particularly East Tenn., etc., Ry. Co. v. Interstate Com. Com'n, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719, and cases there cited, and attention is called to a paragraph in the opinion in that case (181 U.

S. 18, 21 Sup. Ct. page 522, 45 L. Ed. 719) in which the following language is used:

"The prohibition of the third section, when that section is considered in its proper relation, is directed against unjust discrimination or undue preference arising from the voluntary and wrongful act of the carriers complained of as having given undue preference, and does not relate to acts the result of conditions wholly beyond the control of such carriers."

It will be observed that this case arose under the long and short haul clause of the original fourth section of the act and involved the meaning of the phrase "under substantially similar circumstances and conditions," which was eliminated by the amendment of 1910. Act June 18, 1910, c. 309, § 8, 36 Stat. 547 (U. S. Comp. St. Supp. 1911, p. 1288). The real question at issue was whether competition at the longer distance point constituted, or could constitute, a dissimilarity of circumstances and conditions which relieved the road serving the shorter distance point from the obligation imposed by the fourth section, and the Supreme Court answered that question in the affirmative. Examination of the opinion discloses clearly, as we think, that the convincing reason for this conclusion was the fact that the carrier complained of had not caused and was in no way responsible for the discrimination against the shorter distance locality. That discrimination, as was shown, resulted wholly from the lower rates accorded by independent carriers reaching the farther point by other and different routes; and accordingly it was held that the carrier in question, if its rates to the nearer point were reasonable, was not violating the act by meeting at a more remote point conditions there existing which it did not create and could not control. Manifestly the factor deemed decisive in that case is wholly absent from the case at bar, and therefore the ruling then made, notwithstanding the statement above quoted from the opinion, cannot be accepted as sustaining petitioner's contention. Moreover, the administrative authority of the Commission has been materially increased by the amendments of 1906 and 1910, as the Supreme Court observed in the recent Procter & Gamble Case, 225 U. S. 282, 297, 32 Sup. Ct. 761, 56 L. Ed. 1091, and it may be open to doubt whether decisions under the former fourth section would be followed in cases arising under the amended statute.

[3] This, of course, does not meet the argument, based upon the different state of facts here presented, that petitioner is under compulsion as respects the state rates in question, and therefore not chargeable with any violation of law because those rates are relatively much lower than its interstate rates from Shreveport. In the last analysis this claim of coercion would seem to beg the question to be decided, since it assumes that petitioner is bound at all events to observe the rates fixed by the Texas Commission although the order sought to be enjoined justifies the application of higher charges. But if the action of the Texas Commission regarding these intrastate rates is in derogation of the regulating power of Congress, the petitioner is not bound by that action, but has the right to readjust its schedules in conformity with the order of the Interstate Commerce Commission.

205 F.—25

In the report upon which that order is based the Commission has found, upon convincing proofs therein recited, that the local rates here involved were imposed by the Texas Commission for the purpose of favoring the industries and communities of that state. Indeed, the evidence is said "to demonstrate that Texas has a policy of her own with respect to the protection of home industry, which has been made effective by consistent and vigorous action on the part of her Commission." And in this policy, as is further found, the petitioner and other carriers in like situation have apparently acquiesced. This plainly means, nor is it seriously disputed, that these Texas rates were prescribed, not with reference to their intrinsic reasonableness, or on the basis of just compensation for the service rendered, but with the undisguised intention of giving preference and advantage to the dealers of that state as against their competitors in Louisiana and other states. As Commissioner Lane puts it:

"The Texas Commission is acting in loco parentis to the jobbing interests of Texas."

It also means, as the record indicates, that the rates so established have been accepted by petitioner without more, at most, than a perfunctory protest. In view of these uncontradicted facts, we are constrained to reject the plea of compulsion, not merely or mainly because petitioner has assented to the protective policy of the Texas Commission, but because that policy directly affects other states and the flow of commerce from those states, and thereby encroaches upon the field in which federal authority is exclusive and supreme. To hold otherwise in this case is virtually to admit that the purpose of the federal act may be thwarted and its operation made ineffective by the laws and administrative effort of the state of Texas. It is evident, as already stated, that these Texas rates were designed and have the necessary result of securing unjust and arbitrary advantage to the shippers for whom they were provided by restricting the movement of commodities from other states and measurably excluding outside dealers from competing for trade in Texas territory. The effect of this action by the Texas Commission is not merely incidental and unimportant, but direct, substantial, and to an extent prohibitive. In our judgment it is a positive interference with interstate commerce, which Congress alone has power to regulate, and constitutes a violation of the law which Congress, in the exercise of its power, has duly enacted. The pervading purpose of that law was to prevent carriers subject to its provisions from indulging in unfair and burdensome discriminations against persons and localities engaged in interstate commerce.

But if such a patent discrimination as this case discloses cannot be reached, because it is brought about by a state Commission, the law fails in a most important respect to accomplish its wholesome purpose. Moreover, if one state Commission may create and perpetuate such a discrimination, other state Commissions may take similar action for similar reasons, with results which would greatly impair, and indeed largely defeat, the effectiveness of federal regulation. To say that

conditions thus arising do not offend the federal law, and cannot be corrected by the Commission appointed to administer that law, is to say in effect that state authority is superior to federal authority when they come in conflict, whereas the reverse proposition has been repeatedly and invariably affirmed by the Supreme Court of the United States.

It is not claimed that the precise question here presented has been passed upon by the Supreme Court, but in various decisions of that court principles have been laid down which seem to us clearly applicable if not controlling. For example, in the Eubank Case, 184 U. S. 36, 22 Sup. Ct. 280, 46 L. Ed. 416, Mr. Justice Peckham uses the following language:

> "We fully recognize the rule that the effect of a state constitutional provision or of any state legislation upon interstate commerce must be direct and not merely incidental and unimportant; but it seems to us that where the necessary result of enforcing the provision may be to limit or prohibit the transportation of articles from without the state to a point within it, or from a point within to a point without the state, interstate commerce is thereby affected, and may be thereby to a certain extent directly regulated, and in that event the effect of the provision is direct and important, and not a mere incident."

Later, in the Pullman Company Case, 216 U. S. 65, 30 Sup. Ct. 235, 54 L. Ed. 378, Mr. Justice (now Chief Justice) White states certain propositions which are said to be "so conclusively established by the previous decisions of this court as to be now beyond dispute." Among them are these:

> "A state may not exert its concededly lawful powers in such a manner as to impose a direct burden on interstate commerce. * * * Even though a power exerted by a state, when inherently considered, may not in and of itself abstractly impose a direct burden on interstate commerce, nevertheless such exertion of authority will be a direct burden on such commerce, if the power as exercised operates a discrimination against that commerce, or, what is equivalent thereto, discriminates against the right to carry it on."

And more recently, in Southern Ry. Co. v. United States, 222 U. S. 23, 32 Sup. Ct. 4, 56 L. Ed. 72, affirming the validity of the Safety Appliance Acts, Mr. Justice Van Devanter states the principle governing the question there considered, as follows:

> "And this is so, not because Congress possesses any power to regulate intrastate commerce as such, but because its power to regulate interstate commerce is plenary, and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it; that is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce."

This court, also, in Penn. R. Co. v. Interstate Com. Com'n, 193 Fed. 81, following the Illinois Central Case, 215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. 280, upheld orders of the Commission relating to the distribution of coal cars in times of shortage. And in reply to the argument that the carrier could not comply with the orders in question without violating a statute of the state we said:

"It may also be true that the enforcement of regulations in conformity with these orders, if applied to cars for intrastate as well as interstate shipments, would result in some conflict with the duties of petitioner under the laws of Pennsylvania; * * * but, if this is or proves to be the case, it furnishes no ground for our interference, since federal authority to the full extent that it may be exerted supersedes and limits state authority."

It is true that the laws and orders involved in these decisions pertain to the physical operation of interstate railroads, and not to the relations between state and interstate rates; but in our opinion the underlying question is essentially the same in both classes of cases, and the doctrine of the supremacy of federal authority should have the same controlling application in the latter as in the former. If state regulation under state laws, respecting such matters as safety appliances, car distribution, and the like, must be subordinated to and may be virtually annulled by national regulation under the national laws now in force, there is even greater reason for asserting the sufficiency of the existing acts of Congress, and the authority of the tribunal by which they are administered, to remove such a palpably unjust and injurious discrimination in freight charges as is here presented, although that discrimination is caused by the action of a state Commission. This is not to interfere with any power of regulation which a state may rightfully exercise, which does not "affect other states," or materially impede the flow of commerce from one to another, but to give complete and adequate potency to the law which Congress has enacted in pursuance of its plenary and exclusive power to regulate commerce "among the several states." As is said by Sanborn, Judge, in Shepard v. Northern Pac. Ry. Co. (C. C.) 184 Fed. 795, after referring to the Eubank Case, supra:

"By the same mark, because it is a direct regulation of interstate commerce, the nation may regulate and prohibit discriminations wrought by an undue difference between interstate and intrastate rates, although such regulation or prohibition may also to some extent affect and regulate intrastate commerce. For to the extent necessary completely and effectually to regulate interstate commerce the nation by the Congress and its courts may affect and regulate intrastate commerce."

It is the duty of an interstate railroad so to adjust its schedules that all dependent shippers and communities, regardless of imaginary state lines which may divide them, shall be able to use its facilities on relatively equal terms; and the Interstate Commerce Commission, in our judgment, is empowered by the present law to enforce the performance of that duty as occasion may require. The necessity for uniform, comprehensive, and adequate regulation, especially urgent in the vital matter of rate relations, compels assertion of the paramount authority of Congress and the appropriate exercise of that authority in those provisions of the act which are leveled against unjust discriminations, wherever existing or however caused. Indeed, we see no escape from multiplied difficulties arising under our dual form of government, except by broadly defining the constitutional power of Congress and its exertion as manifested in the enactment of the present law, and by upholding the full application of that law to such controversies as the one here considered. We are therefore

in accord with the views of Commissioner Lane, speaking for the majority of the Commission, as expressed in the following extracts from his report:

"An interstate carrier must respect the federal law, and if it is also subjected to state law it must respect that in so far as it can without doing violence to its obligations under the national authority. Before us are carriers which undeniably discriminate directly against interstate traffic. To this charge they plead that all they have done was to obey the orders of a state Commission, as against which they were helpless. They appealed to no court for relief, nor to this Commission. When the state of Louisiana after years of endurance makes complaint to this body, these carriers make no showing of the reasonableness of their rates other than that heretofore dealt with—a traffic adjustment equalizing gateways—and even in this defense all the carriers do not join. * * * While the Texas Commission has evidenced a policy of home protection for its own state cities, there is every evidence that the carriers moving into and within Texas accepted this policy as their own, claiming that not to have adopted it would have led to reprisal on the part of the state authorities. Such conditions may not continue under this act. The interstate carrier which adopts a policy, even under state direction, that makes against the interstate movement of commerce, must do so with its eyes open and fully conscious of its responsibilities to the federal law, which guards commerce 'among the states' against discrimination."

The Interstate Commerce Commission investigated the complaint filed with that body on behalf of the shippers and dealers of Shreveport. In its report of that investigation, and upon proofs that seem to permit no other conclusion, the Commission found the fact of unjust discrimination as alleged, and duly made an order requiring its removal. The Commission also found by necessary inference, as its order clearly indicates, that the interstate commodity rates in question were not unreasonable, and this in effect sanctioned the continuance of those rates. It is likewise a necessary inference from the report and order that the unlawful discrimination against Shreveport, so far as commodity rates are concerned, was caused by the imposition of intrastate rates which are lower than petitioner is justly entitled to charge. This being so, it follows that petitioner is at liberty and has the right to comply with the Commission's order by making a proper increase of its Texas rates. Indeed, since its interstate rates are not excessive, such an increase appears to be the only method of compliance which would be just to both shipper and carrier.

When this order was made, upon the facts so ascertained and reported, it had the effect, in our judgment, of relieving petitioner from further obligation to observe the intrastate rates which the Texas authorities had prescribed. The petitioner was no longer under compulsion in respect of those rates, because the rate situation disclosed by the inquiry was subject in its entirety to the provisions of the federal statute and the administrative control of the Commission. The order of the Commission therefore operated to release petitioner, as regards the intrastate rates in question, from the restraint imposed by the state of Texas; and thereupon petitioner became entitled, if it did not choose to reduce its interstate rates, to comply with the order by advancing its Texas rates sufficiently to remove the forbidden discrimination. Its obedience was due to the superior authority, and it ceased to be bound by any inconsistent obligations. Whether petitioner

should have applied to the courts for relief in the premises, basing its application upon the Commission's order and the rights of petitioner thereunder, or could advance its Texas rates in the first instance, relying upon the order as a defense against any prosecution under Texas laws, is not for us to determine. It is sufficient to hold, as we do, that petitioner cannot resist the order on the ground of involuntary action, because the effect of that order was an exemption of these intrastate rates from Texas authority.

As was suggested at the outset, the general question here involved has been presented in numerous cases, more or less closely allied, and is perhaps the most conspicuous and important subject of current litigation. In the course of that litigation every decision of possible bearing has been repeatedly cited and every opinion critically examined, whilst the ablest lawyers in briefs and at the bar have exhausted the resources of argument. We can add nothing to what has been so often said, and deem it unnecessary to extend the discussion. In our judgment, the order in question was within the authority of the Commission, and ought not to be set aside.

The petition will therefore be dismissed.

MACK, Judge (concurring). I agree that an intrastate rate voluntarily established by the railroads may be the basis for an order of the Interstate Commerce Commission declaring such a rate to involve an undue prejudice as against an interstate rate and requiring that the two rates be equalized. I fully agree, also, that Congress has the constitutional power and may by proper legislation grant to the Interstate Commerce Commission authority to prevent undue prejudice in interstate commerce resulting from a rate not in the true sense voluntary, and irrespective of whether it be interstate or intrastate.

In view, however, of the passage cited from E. Ry. Co. v. Interstate Commerce Commission, 181 U. S. 1, 21 Sup. Ct. 516, 45 L. Ed. 719, and of the decision of this court in Atchison, T. & S. F. Ry. Co. v. U. S., 191 Fed. 856, now pending on appeal in the Supreme Court, I am of the opinion that the Interstate Commerce Commission under the legislation now in force cannot base such an order upon a compelled rate, whether interstate or intrastate, and whether compelled by competition, by statute, by court decree, or by the order of a commission.

In my judgment, the Texas state rates cannot be treated by the Interstate Commerce Commission as if they were absolutely null and void, even if upon direct attack in the state or federal courts they might be nullified and their enforcement permanently enjoined as infringing upon the exclusive power of the federal government to regulate interstate commerce. In the absence of a judicial decree, temporarily or permanently suspending the force and effect of the Texas rates, the railroads would be compelled to obey them, just as the railroads and the public are required to observe interstate rates duly made and published by the railroads, even though they be such as would be set aside for unreasonableness, unjust discrimination, or

undue prejudice on direct attack before the Interstate Commerce Commission.

[4] The order of the Interstate Commerce Commission, therefore, gives only an apparent, but not a real, alternative, either to raise the Texas rates or to lower the interstate rates; in effect it compels the· reduction of the interstate rates to a point far below what the Commission itself considers a reasonable rate, at least until a court of competent jurisdiction shall have enjoined the enforcement of the Texas rates. If the Texas rates here in question must necessarily be held to be involuntary and compelled, I should be of the opinion that the order of the Interstate Commerce Commission must be set aside.

[5] Inasmuch, however, as there seems to be some basis, though slight, for the view that the failure of the railroads to attack the Texas rates was due to their voluntary or negligent acquiescence therein, and that therefore these rates may be said to have been not compelled, but voluntary, in the sense of having been voluntarily assented to, instead of having been actively attacked, and inasmuch as the conclusions of my Brethren are based in part at least upon this view, I concur, for this reason only, in upholding the Commission's order.